## Commonwealth *vs.* Kenneth A. Appleby.

Hampden.   December 3, 1979. — April 1, 1980.

Present: Hennessey, C.J., Quirico, Wilkins, Liacos, & Abrams, JJ.

*Assault and Battery.   Privacy.   Practice, Criminal,* Sentence, Directed
verdict.   *Words,* "Dangerous weapon."

At the trial of an indictment under G. L. c. 265, § 15A, there was suf-
ficient evidence for the jury to find that a riding crop, as it was used by
the defendant, was a dangerous weapon.   [303-307]

The offense of assault and battery by means of a dangerous weapon under
G. L. c. 265, § 15A, requires that the elements of assault be present,
that there be a touching, however slight, that the touching be by
means of the weapon, and that the battery be accomplished by use of
an inherently dangerous weapon, or by use of some other object as a
weapon, with the intent to use that object in a dangerous or potential-
ly dangerous fashion.   [307-308]

Private consensual sadomasochistic behavior is not a defense to the crime
of assault and battery by means of a dangerous weapon under G. L.
c. 265, § 15A.   [308-311]

At the trial of an indictment under G. L. c. 265, § 15A, there was suffi-
cient evidence of the elements of assault and battery by means of a
dangerous weapon to warrant the denial of the defendant's motion for
a directed verdict.   [311-312]

At the trial of an indictment charging the defendant with assault and
battery by means of a dangerous weapon, the judge did not err in
refusing to instruct the jury that intent to cause sexual gratification
would preclude a finding of guilt or that private, consensual sado-
masochistic behavior was an absolute defense to the charge.   [312]

Hennessey, C.J., concurring, expressed reservation about the severity of
the sentence imposed on the defendant.   [312-313]

Indictment found and returned in the Superior Court
Department on July 12, 1978.

The case was tried before *Cross, J.*

The Supreme Judicial Court granted a request for direct
appellate review.

*John P. Ward* for the defendant.

*Dianne M. Dillon,* Special Assistant District Attorney, for the Commonwealth.

QUIRICO, J.   On November 22, 1978, a Superior Court jury convicted Kenneth A. Appleby of assault and battery with a dangerous weapon, to wit:  a riding crop.  G. L. c. 265, § 15A.[1]  The judge sentenced Appleby to eight to ten years in the Massachusetts Correctional Institution at Walpole.  Appleby appealed pursuant to G. L. c. 278, §§ 33A-33G, and we granted his petition for direct appellate review.  He alleges error in (1) the judge's denial of a directed verdict, and (2) the judge's instructions to the jury on the issues of consent and intent.  We affirm the conviction.

Kenneth Appleby and Steven Cromer were engaged in a homosexual, sadomasochistic relationship for over two years, during most of which period they lived together.  Appleby frequently beat Cromer.  Appleby's general defense to the indictments was that Cromer had consented to the beatings, and that he, Appleby, had intended them for Cromer's sexual gratification.  In addition to pressing his arguments on consent and intent in this appeal, he maintains that he should have had a directed verdict because the Commonwealth failed to present a prima facie case of assault and battery by means of a dangerous weapon as set forth in G. L. c. 265, § 15A.

By far the major portion of the Commonwealth's case consisted of the testimony of the alleged victim, Steven Cromer.  There follows a summary of his testimony; material from other sources is so noted.  The summary continues to the point where we first mention Appleby's motion for a directed verdict.

Cromer lived with Appleby during most of the period from June, 1974, until August 31, 1976 (the date of the incident for which Appleby was convicted).  His entire rela-

---

[1] The jury acquitted Appleby on two other indictments charging assault and battery with a dangerous weapon, to wit:  a bat, and assault and battery with a dangerous weapon, to wit:  a whip.

tionship with Appleby, including the homosexual acts, was forced upon him; he lived with Appleby as a "servant," performing household and other duties. Appleby beat him when he was dissatisfied with Cromer's performance of these duties. Their residence was like a "military camp," with Appleby owning a variety of weapons and employing them on persons in his "torture chamber," which Cromer was forced to help design.

In October, 1975, an enraged Appleby beat Cromer badly with a bullwhip and baseball bat, fracturing his kneecap. Cromer was hospitalized for this injury until December 4. He received surgery to repair the kneecap, and he spent several weeks on crutches thereafter.

En route to the hospital, Appleby suggested to Cromer that they tell hospital personnel that Cromer had had an epileptic seizure and fallen down some stairs, and Cromer, who had had seizures before, agreed and maintained the story throughout the hospital stay. They fabricated the story "[t]o cover things up." When he left the hospital, Cromer returned to Appleby's residence in West Springfield, where he resumed his "duties" as best he could.

When asked what distinguished this October, 1975, incident from other beatings, Cromer stated that it was "going a little over what I was used to." The October, 1975, incident formed the basis of the first indictment, on which the jury acquitted Appleby.

A second incident, the subject of the second indictment, allegedly occurred on February 28, 1976, when Appleby beat Cromer with a bullwhip because of displeasure with a sandwich Cromer had prepared. A friend of Appleby was outside at the time, and Appleby called to this person to bring snow to apply to Cromer's wounds. Cromer liked this "attention": "Other beatings I had, nothing came. No attention was made to me like that. It was unusual in that respect." The jury acquitted Appleby on this indictment as well.

The third incident occurred on August 31, 1976. Cromer served Appleby some ice cream which had melted. This en-

raged Appleby, who reached for a riding crop with which he hit Cromer. Cromer described the blow as follows: "He just connected on the back. . . . He was sitting down. . . . [H]e just lashed with it like that (Indicates.) And it just barely connected with my back. There were some thongs at the end and I just felt them hit me, and he was losing his temper. . . . I felt the whip hit me. A glancing blow." Cromer, in his underwear, ran from the house and to a monastery, where a priest encouraged him to telephone his relatives. His brother and sister-in-law came to the monastery for him, and later helped him to remove his personal belongings from Appleby's residence. Cromer never returned to Appleby's place thereafter. The jury convicted Appleby on the indictment involving the riding crop incident.

Cromer maintained that Appleby was sadistic, but denied that he was engaged in a sadomasochistic relationship with Appleby. He denied that he was a homosexual, and he claimed the homosexual acts were forced upon him from the beginning. He said he could not recall whether violence and sexual activity with Appleby occurred close in time. Cromer said "Mr. Appleby explained later that he delighted in violence to an extent that he said it was almost sexual or sexual."

Cromer acquiesced in this relationship because Appleby "took me over in a way . . . . He had convinced me that people were constantly following me and observing my every action and reporting to him." Cromer told no one about the relationship, and sought aid from no one, because Appleby told him no one would believe him, that he was a "hippie," a "weirdo," and on drugs. He thought that even the police could not "stop" Appleby. He was under "duress" the entire time because he feared that Appleby would harm him or members of his family if he did not continue in their relationship.

At one point Cromer stated that he never protested or told Appleby to stop, because he was afraid to do so. At

another point he stated that he did protest Appleby's sadistic activity.

Cromer had a low opinion of himself for having got into the situation, and he "lost" himself in his functions at the Appleby residence. He said that after the bullwhip incident, "I felt that I was just a joke — that I had taken the beating and had done nothing about it. Just took the beating, and when he told me to clean up the food off the floor after that, I did, and Jay Robbins [Appleby's friend] came in and saw me on my hands and knees doing this."

At the close of the Commonwealth's case-in-chief, which covered almost 700 pages of the trial transcript, Appleby moved for a directed verdict on the basis that the Commonwealth had failed to establish a prima facie case. The judge denied the motion. The defendant then presented evidence which, including his own testimony, covered almost 600 pages of the transcript. The defendant renewed his motion for a directed verdict at the end of the trial, and it was again denied.

Since the principal question for the jury was one of the credibility of the two main witnesses, Cromer and Appleby, we also summarize Appleby's account of his relationship with Cromer. This summary will continue to the point where we refer to the defense witness Webster.

Appleby's general defense to the three charges was that Cromer had consented to their sadomasochistic relationship. He admitted that he had whipped or beaten Cromer almost daily. He denied, however, that the fractured kneecap was caused by a beating; rather, he asserted the truth of the story of the epileptic seizure and fall down the stairs. (He also testified to witnessing a prior seizure and presented medical evidence of Cromer's epilepsy.) As to the second incident, he denied that he ever beat Cromer severely and said that February 28, 1976, did not stick out in his mind as involving any incident different from the usual daily whippings. Regarding the riding crop incident, Appleby testified that Cromer ran out of the house in his underwear on a rainy night, but said that this occurred on July 24,

1976, after a conversation, and that there was no beating or whipping of any kind that evening.

Appleby trained attack dogs for a living, and kept whips in his house for that purpose. He ascribed the initiation of the sadomasochistic activities entirely to Cromer. He met Cromer while the latter was "hustling" sex for money on a Springfield street. At that time Appleby was a "conventional" homosexual. The first night they met, Cromer showed him a braided rope he had made from clothesline, and said he liked to be beaten with that. Appleby refused to engage in beatings. Cromer beat himself with the clothesline, and Appleby told him not to use it. In the months before Cromer moved in, their "regular sexual ritual" consisted solely of fellatio and anal intercourse. Cromer told Appleby that he took drugs, and Appleby saw Cromer injecting himself and taking pills.

One evening, Cromer asked to go home with Appleby; the latter assented on the condition that Cromer not bring any drugs. Shortly after they arrived, Cromer spotted one of the whips Appleby used to train dogs. Cromer asked Appleby to beat him with the whip, but the latter refused.

The next day, Cromer telephoned Appleby and asked if he could come to live with him, because some people were following him and trying to kill him. Appleby told Cromer he had taken too many pills. Shortly thereafter, Cromer arrived at Appleby's home and begged to be let in. Appleby told him he could move in if he fulfilled four conditions; Cromer balked at the condition that he give up drugs, but finally acquiesced, and moved all of his belongings into Appleby's home. One of the other conditions was that there would be no beatings, but within two weeks Appleby reneged on this condition and agreed to strike Cromer for the latter's sexual fulfilment.[2] He did this because Cromer begged for it, and because he, Appleby, had a sexual reaction to the sexual effect of the beatings on Cromer.

---

[2] The two other conditions were that Cromer (a) attend church every Sunday with Appleby, and (b) not engage in any "hustling."

After this, their relationship became a sadomasochistic one, as well as homosexual, and involved daily beatings of Cromer. At first, Cromer was able to attain sexual satisfaction with only a few strokes of a whip, but gradually he began to require more variety. Together they acquired or constructed leg irons, handcuffs, a torture rack, several other implements of torture, and a room which Cromer liked to call the "torture chamber."

When shown the riding crop on direct examination, Appleby denied ever using it on Cromer. On cross-examination, however, he admitted that the riding crop "was employed many times," and said that Cromer "favored" the crop, that "he would be whipped until he reached sexual orgasm." The riding crop never caused "welts," but only "redness;" in fact none of the beatings caused more than "redness." Appleby never enjoyed whipping Cromer; he enjoyed the sexual effect it had on Cromer and the fact that Cromer allowed him to have anal intercourse after each beating. When asked if he intended to strike Cromer, he said, "I did it with the intent to turn him on sexually."

Appleby had several other sadomasochistic relationships after Cromer left, and used the implements he had purchased or made for Cromer. All of the implements, including the riding crop, were found at Appleby's house in 1978.

Appleby presented as part of his case expert testimony of Dr. John Peter Webster, a minister and psychotherapist. Webster, who had counseled Appleby after his arrest, also had some knowledge of sadomasochism. We summarize his testimony. He defined sadomasochism as involving a fusion of the sexual and aggressive drives, and said the masochist may need to be "punished" in order to release inhibited sexual feelings. He said that the beatings are generally inseparable from the sexual part of the relationship, and that typically the masochist needs to feel helpless and dependent. Cromer's staying with Appleby under fear of harm to himself or his family "would certainly fit the pattern of masochism."

The propriety of the denial of the motions for a directed verdict and the correctness of the judge's instructions to the jury both turn on certain questions of law, and we therefore address them first. Those questions are: (1) whether the riding crop was a "dangerous weapon" for purposes of G. L. c. 265, § 15A, (2) what sort of criminal intent is required by said § 15A, and (3) what role Appleby's consent defense should play in this case.

1. General Laws c. 265, § 15A reads: "Whoever commits assault and battery upon another by means of a dangerous weapon shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than one thousand dollars or imprisonment in jail for not more than two and one half years." Courts have classified dangerous weapons into two categories: those dangerous per se and those dangerous as used. See *Commonwealth* v. *Farrell*, 322 Mass. 606, 615 (1948).

(a) A "dangerous weapon per se" is an instrumentality designed and constructed to produce death or great bodily harm. *State* v. *Luckey*, 69 Ohio Op. 2d 111, 113 (Ohio App. 1974). See also *Farrell, supra.* Thus, for example, firearms, daggers, stilettos and brass knuckles are usually classified as dangerous per se, because they are designed for the purpose of bodily assault or defense. On the other hand, pocket knives, razors, hammers, wrenches and cutting tools are not so classified. *People* v. *Vaines*, 310 Mich. 500, 505 (1945) (dictum). In one case dealing with a "driving whip," the court held that the whip was not dangerous per se because it was not designed for the offense or defense of *persons.* *State* v. *Page*, 15 S.D. 613, 615-616 (1902).[3]

A riding crop is not designed to inflict death or serious bodily harm upon either persons or animals. It is designed

---

[3] *Page* was decided in the context of a statute prohibiting rioting, and providing for higher penalties for rioting while carrying a "deadly or dangerous weapon." Because no use of the weapon was required for conviction of the higher offense, the court held that the weapon must be dangerous per se. *State* v. *Page*, 15 S.D. 613 (1902).

to inflict temporary pain in order to cause an animal to move. Therefore it is not dangerous per se.

(b) Weapons which are not dangerous per se, but which may be used in a dangerous fashion, may also be "dangerous weapons." See *Farrell, supra* (lighted cigarette); *Commonwealth* v. *LeBlanc,* 3 Mass. App. Ct. 780, 780 (1975) (automobile door used to strike police officer); *Commonwealth* v. *Tarrant,* 2 Mass. App. Ct. 483, 486-487 (1974) ("kitchen-type" knife and German shepherd dog may both be used as "dangerous weapons"), *S. C.,* 367 Mass. 411 (1975); *United States* v. *Loman,* 551 F.2d 164, 169 (7th Cir.) (walking stick used with enough force to break it), cert. denied, 433 U.S. 912 (1977); *United States* v. *Johnson,* 324 F.2d 264, 266 (4th Cir. 1963) (chair brought down upon victim's head); *Bennett* v. *State,* 237 Md. 212, 216 (1964) (microphone cord tied around victim's neck, causing inability to speak and marks on throat); *Vaines, supra* at 505-506 (ordinary jack-knife); *People* v. *Buford,* 69 Mich. App. 27, 30 (1976) (dictum) (automobile, broomstick, flashlight and lighter fluid may all be dangerous as used); *State* v. *Howard,* 125 N.J. Super. 39, 45 (1973) (straight razor). Generally it is held to be a question for the fact finder whether the instrument was so used in a particular case. *Farrell, supra* at 614-615. *Tarrant,* 2 Mass. App. Ct. at 487. *Vaines, supra* at 505. *Buford, supra* at 32. *Howard, supra* at 47.

A riding crop, such as the one involved in this case, is capable of being used to inflict serious bodily harm, and possibly even to cause death. The riding crop Cromer identified as that which Appleby used on August 31, was admitted in evidence. We have examined it. It is approximately eighteen inches in length, and constructed of heavy braided leather wrapped around a solid leather core. At its thickest point, it is slightly less than one inch in diameter, tapering off to a diameter of about one-third of an inch. Cromer and Appleby both testified that leather thongs were missing from the end by the time of the trial. The riding crop is more substantial than one might anticipate an ordinary riding crop to be. It resembles instead a short whip. We

are satisfied that it could be employed to inflict serious bodily harm. Therefore, we cannot hold as a matter of law that it can never be a dangerous weapon as used.

(c) The jury in this case had to find that the riding crop was in fact dangerous as used in order to convict Appleby under § 15A. Whether they could lawfully have done so depends on the gravamen of the offense of assault and battery by means of a dangerous weapon as set forth in § 15A.

The meaning of "dangerous weapon" depends to a certain extent on the context in which it is used. We have held that the thrust of the offense of assault with a dangerous weapon, for example, is the outward demonstration of force which breaches the peace, and therefore even an unloaded gun (known only by the defendant to be unloaded) may be a dangerous weapon in that context. *Commonwealth* v. *Henson,* 357 Mass. 686, 692 (1970). See also *United States* v. *Maynard,* 452 F.2d 1087, 1088 (1st Cir. 1971) (assault with dangerous weapon does not require proof gun was loaded). The gist of the offense of armed robbery is robbery "while armed," and thus there is no need to prove the defendant used a weapon other than to threaten. *Henson, supra* at 690. *Commonwealth* v. *Tarrant,* 367 Mass. 411, 415-416, 418 (1975) (dog may be "dangerous weapon" for armed robbery, G. L. c. 265, § 17, and Commonwealth need not prove actually dangerous or used in harm-inflicting manner).

Thus the relevant behavior for the offense of assault with a dangerous weapon, G. L. c. 265, § 15B, is an outward demonstration of force, and § 15B requires only apparent ability to injure. *Henson, supra* at 692-693. The behavior for robbery while armed with a dangerous weapon, G. L. c. 265, § 17, which distinguishes it from unarmed robbery, G. L. c. 265, § 19, is the objectively menacing behavior of the defendant with the instrumentality causing fear in his victims. *Tarrant,* 367 Mass. at 415. Whether a weapon not dangerous per se qualifies for either of these statutory crimes is a question of fact to be decided "by objective standards

and not by the victim's subjective apprehension." *Tarrant*, 367 Mass. at 416. *Henson, supra* at 693.

One of the principal distinctions between assault by means of a dangerous weapon and assault and battery by means of a dangerous weapon is in the punishment. The maximum penalty for the former is five years, G. L. c. 265, § 15B, and for the latter is ten years, G. L. c. 265, § 15A. We must therefore ask what behavior distinguishes the two crimes, and whether the meaning of "dangerous weapon" is different.

"The definition of an assault is, an attempt or offer with force and violence to do injury to a person either from malice or wantonness; and a battery is where an injury is actually inflicted under such circumstances." *Commonwealth* v. *Ruggles,* 6 Allen 588, 590-591 (1863). "An assault and battery is the intentional and unjustified use of force upon the person of another, *however slight . . .*" (emphasis supplied). *Commonwealth* v. *McCan,* 277 Mass. 199, 203 (1931).[4]  Under § 15A, the battery must be accomplished *by means of* the dangerous weapon, and not merely while possessing the weapon. *Salemme* v. *Commonwealth,* 370 Mass. 421, 424 (1976). *Commonwealth* v. *Manning,* 6 Mass. App. Ct. 430, 436, 438 (1978). *Commonwealth* v. *Jacobs,* 6 Mass. App. Ct. 618, 622-623 (1978). Therefore, § 15A requires an assault by means of a dangerous weapon, see *Henson, supra,* and also an intentional, unjustified touching, however slight, by means of that dangerous weapon. The criminal law of assault and battery by means of a dangerous weapon expresses society's desire to punish

---

[4] The judge in Appleby's case charged the jury that a battery "is the intentional and unjustified use of force, however slight, upon the person of another. Now, not every touching or brushing is a battery. It must be intentional touching or brushing. Everyday social intercourse of urban and suburban life in shopping and public assemblies, in sporting events, persons in crowds are subject to a certain amount of jostling, pushing and shoving — while these contacts may be somewhat offensive, they do not constitute battery because they enjoy a measure of justification if they're not excessive. So there can be a touching or brushing and that can be a battery if it's intentional."

the use of an instrument which is capable of producing serious bodily harm. We hold that there was sufficient evidence for the jury to find that the riding crop, used as it was by Appleby in this case, was a dangerous weapon.[5] The law need not wait until the instrument actually does cause serious bodily harm in order to classify the weapon as dangerous. Any touching with a potentially dangerous weapon can be assault and battery by means of a dangerous weapon for purposes of § 15A, provided that the assault element and the intentional application of force are established. *Commonwealth* v. *Hawkins*, 157 Mass. 551, 553 (1893), and cases cited.

2.. We next examine the type of criminal intent necessary for the crimes punishable under G. L. c. 265, § 15A. It has been held that assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A) is a general intent crime in Massachusetts. See *Commonwealth* v. *Randall*, 4 Gray 36, 38-39 (1855); *Commonwealth* v. *Jones*, 6 Mass. App. Ct. 750, 759 n.8 (1978). Compare G. L. c. 265, § 15A, with G. L. c. 265, § 14 (mayhem: "with malicious intent to maim or disfigure" and "by such assault disfigures") and G. L. c. 265, § 15 (assault with intent to murder or maim); cf. *Commonwealth* v. *Hogan*, 379 Mass. 190, 192 (1979). Section 15A does not require specific intent to injure; it requires only general intent to do the act causing injury. *Hawkins, supra.* See generally W.R. Lafave & A.W. Scott, Jr., Criminal Law § 28 (1972).[6]

---

[5] Of course, the question whether a weapon is dangerous as used is always one for the fact finder. "In resolving this issue the jury may consider the nature, size, and shape of the object as well as the way in which it is handled or controlled." *Commonwealth* v. *Tarrant*, 367 Mass. 411, 416 (1975). Thus the holding of the present case should not be construed to mean that any intentional unjustified touching with an object previously held in a different case to have been *capable* of being a dangerous weapon constitutes a crime under G. L. c. 265, § 15A. A reasonable jury might well reach a different conclusion as to a riding crop when used in different circumstances.

[6] Weapons which are dangerous per se will qualify for § 15A convictions when used to commit an assault and a battery of any kind, and

The required intent is satisfied by proof of intent to commit the lesser included crime of assault with a dangerous weapon. See *Henson, supra*; *Commonwealth* v. *Slaney*, 345 Mass. 135, 137-139, 141 (1962). Once an actor intends to commit assault with an object capable of causing bodily harm,[7] he is threatening to use the instrumentality in a dangerous fashion. The offense of assault and battery by means of a dangerous weapon is complete once the threat is consummated by the application of any force upon the victim by means of the instrumentality. *Hawkins, supra.* This effectuates the policy of § 15A to deter the use of "neutral" objects in a dangerous fashion.

In sum, the offense of assault and battery by means of a dangerous weapon under G. L. c. 265, § 15A, requires that the elements of assault be present (see *Henson, supra*; *Slaney, supra*), that there be a touching, however slight (*McCan, supra*), that that touching be by means of the weapon (*Salemme, supra*), and that the battery be accomplished by use of an inherently dangerous weapon, or by use of some other object as a weapon, with the intent to use that object in a dangerous or potentially dangerous fashion.

3. The evidence in this case must be viewed in a strained manner in order to support Appleby's argument that the jury were required to find that Cromer consented to be hit with the riding crop. Cromer testified that he did not consent to any of the beatings, that the riding crop incident oc-

---

without a jury determination that the weapon was dangerous as used. This is because public policy discourages the use of such weapons, and persons are charged with knowledge of their inherently dangerous nature. See *Commonwealth* v. *Smith*, 312 Mass. 557, 558-560 (1942); *Commonwealth* v. *Jones*, 6 Mass. App. Ct. 750, 758 (1978). See also *Tarrant*, 367 Mass. at 416 (for armed robbery, where weapon not dangerous per se, potential danger must be assessed by fact finder using objective standards and not victim's subjective apprehension).

[7] "Bodily harm" is defined as "any hurt or injury calculated to interfere with the health or comfort of the [victim]." *Commonwealth* v. *Farrell*, 322 Mass. 606, 621 (1948), quoting from *Rex* v. *Donovan*, [1934] 2 K.B. 498, 507.

curred after an argument over melted ice cream, and that he immediately ran from the house when Appleby "lost his temper" and struck him. Appleby did not testify that there was any beating that evening which related to sexual activity or to which Cromer otherwise consented; he flatly denied that a beating had occurred on the night Cromer ran to the monastery. He further said this night was July 24, but Father Murray (from the monastery), Leon Cromer (Cromer's brother), and Mary Cromer (Cromer's sister-in-law) all testified that the monastery incident occurred on August 31. Furthermore, the riding crop incident was remote in time from the earlier alleged incidents, when a claim that Cromer consented to the relationship might have received more support in the evidence.

The only conceivable way that consent by Cromer on August 31 could be raised by the evidence is by inferences that a) Cromer consented to the relationship generally, and b) Appleby subjectively believed on the night in question that Cromer would consent to be hit with the crop on the basis of his past behavior. Giving Appleby the benefit of this rather strained construction, we shall briefly discuss the legal viability of Appleby's contention that as a matter of law Cromer could consent to their sadomasochistic relationship.

(a) Assuming that the riding crop incident occurred in relation to sexual behavior, the question is whether the State can regulate, by the law of assault and battery, violent behavior which occurs in private, consensual sexual relationships.

We held in *Commonwealth* v. *Balthazar*, 366 Mass. 298, 302 (1974), that G. L. c. 272, § 35, prohibiting "unnatural and lascivious" acts, "must be construed to be inapplicable to private, consensual conduct of adults. We do so on the ground that the concept of general community disapproval of specific conduct, which is inherent in § 35, requires such an interpretation. We do not decide whether a statute which explicitly prohibits sexual conduct, even if consensual and private, would be constitutionally infirm."

After *Balthazar,* consent is a defense to a charge of "unnatural and lascivious" acts under c. 272, § 35. See also *Commonwealth* v. *Hill,* 377 Mass. 59, 62-63 (1979) (applying *Balthazar* retroactively); *Balthazar* v. *Superior Court,* 573 F.2d 698, 699 (1st Cir. 1978) (dictum); *People* v. *Onofre,* 72 App. Div. 2d 268 (N.Y. 1980). Appleby has cited no case, and we are aware of none, extending protection on either statutory or constitutional grounds beyond the sexual acts and to accompanying force or violence by means of dangerous weapons. See generally *Cotner* v. *Henry,* 394 F.2d 873 (7th Cir.), cert. denied, 393 U.S. 847 (1968); *Towler* v. *Peyton,* 303 F. Supp. 581 (W.D. Va. 1969) (defendant may constitutionally be convicted of forced acts of sodomy with wife). Any right to sexual privacy that citizens enjoy, and we do not here decide what the basis for such a right would be if it exists,[8] would be outweighed in the constitutional balancing scheme by the State's interest in preventing violence by the use of dangerous weapons upon its citizens under the claimed cloak of privacy in sexual relations. See generally *Balthazar* v. *Superior Court, supra* at 701 (dictum) (sadomasochistic behavior "universally condemned"); *Onofre, supra* (dictum) (privacy right not absolute; State may regulate conduct which "has the potential for working harm"; prevention of "physical violence and disorder" probably valid State interest).

General Laws c. 265, § 15A, is not aimed at regulating sexual conduct. Appleby was in no way charged with a crime for committing homosexual acts. Rather he was tried for violating a statute that implies, as a matter of public policy, that one may not consent to become a victim of an assault and battery with a dangerous weapon. *Farrell, supra* at 620-621. See also *Commonwealth* v. *Collberg,* 119 Mass. 350 (1876).

---

[8] See generally *Commonwealth* v. *Balthazar,* 366 Mass. 298, 301 n.2 (1974), and cases cited.

(b) The fact that violence may be related to sexual activity (or may even *be* sexual activity to the person inflicting pain on another, as Appleby testified) does not prevent the State from protecting its citizens against physical harm. The invalidity of the victim's consent to a battery by means of a dangerous weapon would be the same, however, whether or not the battery was related to sexual activity. The general rule is: "It is settled that to commit a battery upon a person with such violence that bodily harm is likely to result is unlawful, and consent thereto is immaterial." *Farrell, supra* at 620.[9] Regardless of whether sexual activity was involved in the incident in question, Cromer's consent to assault and battery upon him by Appleby by means of a dangerous weapon cannot absolve Appleby of the crime charged punishable under G. L. c. 265, § 15A.

4. Appleby alleges that the judge erred in denying his motions for a directed verdict.[10] The standard we apply is whether there was enough evidence in the case-in-chief, when taken in the light most favorable to the Commonwealth, "that could have satisfied a rational trier of fact of each [essential element of the offense] beyond a reasonable doubt." *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979). *Commonwealth* v. *Rosenberg,* 379 Mass. 334, 337 (1979).

We hold that the Commonwealth presented in its case-in-chief enough evidence of the elements of assualt and battery

---

[9] *Farrell* involved a female victim who had gone to a hotel room with the defendant, apparently for the purpose of having sexual intercourse, although this is not clearly stated in the review of the evidence. The defendant cut her with a razor and disfigured her body with lighted cigarettes. It appears from the facts that she neither knew this would occur nor consented to it, but this court held that as a matter of law she could not have consented.

[10] The Commonwealth argues that the classification of the riding crop as a dangerous weapon is not properly before this court because Appleby did not state grounds for his motion for directed verdict and the thrust of his defense was consent. The motion for a directed verdict raises the question of the sufficiency of the evidence as to all essential elements of the offense, however. *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-678 (1979).

with a dangerous weapon, to which Cromer by law could not consent, to support the denial of the motion. We have already said that an assault with a dangerous weapon coupled with slight, intentional touching can qualify for assault and battery by means of a dangerous weapon under G. L. c. 265, § 15A. Even if Appleby subjectively intended to use the crop for his own sexual purposes, the evidence was sufficient to permit the jury to find that he possessed the requisite intent to use the riding crop in a dangerous manner and thereby commit a battery.

The evidence, both at the close of the Commonwealth's case and after both sides had rested, supports a jury finding that Appleby intentionally placed Cromer in fear and struck him with the riding crop, an instrumentality which was then being used as a dangerous weapon. There was no error in the denial of the directed verdict.

5. Appleby alleges error in the jury instructions, and in the denial of his request for instructions that (a) intent to cause sexual gratification precludes a finding of guilty of the offense charged, and (b) private, consensual sadomasochistic behavior is an "absolute defense to the charge of assault and battery with a dangerous weapon." We have reviewed the judge's charge, and find no error. Appleby's requested instructions squarely conflict with our holdings today and with the holdings of *Farrell, supra.*

For all the foregoing reasons, we affirm Appleby's conviction. While we express some reservation on the severity of the sentence imposed for the particular assault and battery on August 31, 1976, as established by the jury verdict, albeit an assault and battery by means of a dangerous weapon, that subject is not open to review by this tribunal. See G. L. c. 278, §§ 28A-28C.

*Judgment affirmed.*

HENNESSEY, C.J. (concurring). I concur with the result and the reasoning of the court's opinion. I add these few

words to bring emphasis to the court's expressed "reservation" as to the severity of the sentence imposed. The only incident which resulted in a guilty verdict was minor. It was a blow which "barely connected" with the victim's back; it was a "glancing blow," with no evidence of visible injury or after effects. We may speculate that the sentencing process was perhaps influenced by the indictments as to two more serious episodes of violence. However, the jury, by their not guilty verdicts, rejected those charges, and as a consequence they would have no proper bearing on the sentence. Perhaps the sentence here was unduly influenced by knowledge of other charges pending against the defendant at the time of this trial. Perhaps, also, the sentence was influenced by certain related circumstances which are abhorrent to most persons, but the defendant was not charged with those circumstances in any indictment. In sum, the sentencing result here is one which focuses on the compelling need for reasoned application of the broad sentencing discretion ordinarily available to our trial court.