NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-395                                          Appeals Court


COMMONWEALTH  vs.  AKUR BIOR.


No. 14-P-395.

Middlesex.     June 8, 2015. - August 28, 2015.

Present:  Kafker, C.J., Rubin, & Milkey, JJ.


Assault and Battery by Means of a Dangerous Weapon.  Evidence,
     Credibility of witness.  Dangerous Weapon.  Words,
     "Dangerous weapon."


     Complaint received and sworn to in the Malden Division of
the District Court Department on September 30, 2011.

     The case was tried before Dominic J. Paratore, J.


     James R. Knudsen for the defendant.
     Nicole Marie Nixon, Assistant District Attorney, for the
Commonwealth.


     MILKEY, J.  Following a jury trial in the District Court,

the defendant was convicted of assault and battery by means of a

dangerous weapon.  G. L. c. 265, § 15A(b).  Although we conclude

that the trial evidence was sufficient to support that

conviction, we agree with the defendant that the introduction of

evidence regarding pretrial probable cause hearings constituted reversible error.  We therefore vacate the judgment.

Background.  1.  The incident.  The defendant was a member of a local Sudanese community that met in a church in Malden. On the evening of August 21, 2011, a fight broke out in the church kitchen between the defendant and Mary Deng.  The two women, whose husbands were cousins, had long had a fractious relationship.

When the defendant entered the church kitchen, Deng was already there making tea and doughnuts.  The witnesses (including Deng and the defendant) had widely divergent versions of what then transpired, e.g., regarding which of the women was the initial aggressor.  However, many of the key facts are not in dispute.  It is uncontested that the two women started calling each other names and throwing things (including pieces of dough) at each other.  As the defendant herself admits, at one point she picked up a thermos from the table and threw it at Deng.  According to Deng's testimony, the thermos, which Deng had filled with hot water, hit her in the forehead and the hot water spilled onto her, causing serious burns.  It is not clear if the water escaped from the thermos when the interior glass portion of it broke, or because the top came off when it was thrown.  On the latter issue, Deng stated, in response to a

question whether the top was on the thermos, "The top -- like the top fell on the table because I didn't close it."

The extent to which the defendant's throwing the thermos was provoked by Deng's actions was sharply disputed at trial, and the defendant argued self-defense. The defendant testified that by the time she threw the thermos, Deng had used a teapot to splash hot water onto her and had picked up a knife. Deng admitted that she grabbed the teapot to splash water on the defendant but claimed that this occurred after the thermos was thrown and that bystanders prevented her from doing so. She denied ever brandishing a knife.

2. The immediate aftermath. After Deng's husband, Martin Ayoal, telephoned 911, a police officer arrived at the scene and interviewed the two women individually. According to his testimony, both women were wet and agreed that they were involved in "a mutual altercation"; neither wanted to pursue a prosecution. The officer did not arrest either woman or conduct any further investigation because, in his words, "It appeared to me just a mutual fight between two ladies, and they both stated they didn't want to pursue this in court."

3. Trial testimony regarding probable cause hearings. Deng eventually on her own applied for a criminal complaint in the District Court. The clerk-magistrate held a probable cause hearing at which -- according to Deng's trial testimony -- the

defendant "admitted she burned me with the hot water." The jury learned that after the clerk-magistrate hearing, Deng was allowed to proceed with her case, and a complaint issued charging the defendant with assault and battery by means of a dangerous weapon, to wit, hot water. The jury also learned that the defendant had filed her own application for a criminal complaint, but that this prosecution was not allowed to proceed.[1] In light of all the testimony about what occurred in the clerk-magistrate process (some of which the judge himself elicited), the judge sua sponte instructed the jury about that process as follows:

> "If an incident occurs and there are no arrests, or even if there are arrests or there are police involved and don't make an arrest, private citizens such as yourself and such as the witness or anybody else has a right to seek criminal complaints at the District Court level.

> "You come to court, you swear out a statement to the clerk magistrate, and they set up a hearing. And you go to a hearing, and the clerk determines whether or not process should issue; not whether or not someone is guilty or innocent but whether or not the complaint should issue.

> "Remember I told you that a complaint is nothing but a piece of paper that brings people to court to answer charges. So, a clerk magistrate or assistant clerk makes a decision whether the case should go forward. It means

---

[1] The Commonwealth accurately points out that Deng's specific testimony was that the defendant's charges "were dropped," suggesting that perhaps the defendant simply chose not to pursue them rather than that she was prevented from doing so. Viewing Deng's words in context, including in light of what subsequently occurred at the trial, we have little doubt that the jury readily could have inferred that the defendant's request that charges be pursued was denied.

nothing more than that. It's a mechanism by which people can come before the court and present their case . . . ."

Immediately after the instruction was given, the prosecutor asked Deng whether the defendant had "appealed that decision about the charges being dropped against you?" Before Deng responded, defense counsel asked to be seen at side bar. The side bar colloquy was not recorded, although it is apparent that the defendant objected to the question asked, because the judge sustained that objection when the parties went back on the record. According to a postappeal motion to reconstruct the record filed by the defendant, defense counsel at side bar also moved to strike the prior testimony on this point and requested a curative instruction, and the judge denied both requests.[2] In any event, the judge's sustaining the defendant's objection to the question of whether the defendant appealed the decision not to issue a criminal complaint against Deng brought an end to this line of questioning for the time being. However, later in the trial, the prosecutor elicited from the defendant that the charges she had attempted to bring against Deng related to her claim that Deng had brandished a knife at her. When the prosecutor then asked, "And those charges did not issue; correct?" the judge sustained the defendant's objection.

_____

[2] As discussed infra, the trial judge allowed the postappeal motion, but its status remains in limbo after the Commonwealth filed a motion to reconsider on which no action was taken.

4.  Testimony regarding bystanders.  Deng testified that there were approximately twenty to twenty-five eyewitnesses to the altercation.  In her own testimony, the defendant claimed that the only people in the kitchen at the time were she herself, two of her young children,[3] and Deng.  Only two other people who allegedly witnessed the incident testified.  Nyaring Monykec, who was called by the Commonwealth, testified that she had been working with Deng alone in the kitchen, left, and that when she returned, the fight had already begun.  She stated that she saw only the defendant throwing things, that she did not see the defendant's children in the kitchen, and that she did not see Deng holding a knife.  With regard to the number of people in the room, she estimated there to be fifty to sixty, although on redirect, she suggested that there may have been fewer.  The other bystander who testified was Youm Mayola, who was called by the defense.  She testified that both parties were throwing things at each other (and specifically that she had seen Deng throw a glass at the defendant) and that the defendant's children were by the defendant's side the entire time.  Mayola was not specifically asked about the number of people in the

---

[3] The defendant claimed that the children clung to her throughout the fight, thereby preventing her from readily leaving.  She also claimed that her actions were motivated in part by fear for her children's safety.

room, but she noted that she had to look over others in order to see the fight.

5. Prosecutor's closing argument. During her summation, the prosecutor made several references to the conflicting testimony regarding the number of bystanders present. She pointed out that the defendant's contention that only the combatants and the defendant's children were present was undercut by the other witnesses including Mayola (who was called by the defense), and she ascribed a particular motive to the defendant's testimony on this point:

> "Defense counsel wants you to believe that Akur Bior and Mary Deng were alone in this room, except for [the defendant's] children, that they were the only people in this room. The defendant wants you to believe that so badly because then no one will be able to confirm or deny her story about the knife. . . . Doesn't that match up perfectly with her story about this knife that no one heard about that day, that police didn't hear about."

Later in the closing, the prosecutor offered the following with regard to the paucity of testimony from other eyewitnesses:

> "And I'd also suggest that within this Sudanese community I think we all go[t] the sense, especially from Nyaring [Monykec], she stated specifically that, 'In our culture you don't get involved in things if they don't involve you.' So I would suggest that's one explanation for why there aren't 20 to 25 people here to say exactly what happened that day.

> "She says, 'In our culture you don't get involved if it doesn't involve you.' She saw this verbal argument. She wasn't sure what it was, all she knew was it didn't involve her.

"Also, we also got the sense about the Sudanese community that people were telling Mary Deng and Martin, 'Don't call the police' or 'Don't call the ambulance because then the police [will] come.'

"So there's also this sense of solving problems within the community. This was a meeting actually set up to kind of help women keep the peace within their community.

"So there is this sense, I would suggest, in the Sudanese community that they deal with their problems in house and that they don't get the police involved.

"So I'd suggest to you that that's another reason why we don't have 20 to 25 people here from that community telling you exactly what happened in the kitchen that day."

Discussion. 1. Testimony regarding clerk-magistrate process. The defendant argues that the judge erred in admitting (and in part eliciting) testimony that the criminal case the defendant wanted brought against Deng was not allowed to go forward, while the case that Deng wanted brought against her was. We agree. For the reasons explained below, we also agree that the error created a substantial risk of a miscarriage of justice, thus warranting reversal even if the issue was not adequately preserved.[4]

---

[4] As noted, the defendant maintains that soon after the evidence was admitted, she moved to strike it at an unrecorded sidebar. After the appeal was filed, and without asking for a stay of that appeal, the defendant filed a motion to reconstruct the record consistent with her recollection. The trial judge endorsed that motion as allowed, but the Commonwealth promptly moved for reconsideration on the ground that the motion was allowed without the Commonwealth having an opportunity to be heard. Both parties report that no action has been taken on the motion for reconsideration. At least on the record properly before us, the defendant did not adequately preserve her claim

As the defendant accurately highlights, her claim of self-defense rose or fell principally on whether the jury credited her allegations about what Deng had done (or threatened to do) before the defendant threw the thermos.  The admission of the evidence regarding the clerk-magistrate's rulings went to the heart of that defense.  As the Commonwealth acknowledges, this "evidence related to the principal issue at trial."

"The judicial imprimatur on the [clerk-magistrate's probable cause rulings] lends [them] significant weight." Commonwealth v. Foreman, 52 Mass. App. Ct. 510, 515 (2001). "Furthermore, to a jury without more guidance, it would likely appear that a [judicial official] had already reviewed the facts and decided the credibility dispute that the jury were being asked to consider."  Ibid.  We recognize that the judge here did offer some guidance to the jury, by cautioning them against reading too much into the clerk-magistrate's decision to allow Deng's criminal complaint to proceed.  However, the instruction did not address what, if anything, the jury could take from the

of error.  Although she did lodge some successful objections during this line of questioning, at key points she did not object and the answers came in evidence.  It is true, as the defendant observes, that the most objectionable question on this point came from the judge, not the prosecutor, but this does not excuse the defendant's failure to object.  Because we conclude that the error caused a substantial risk of a miscarriage of justice in any event, we need not resolve the dispute over the reconstruction of the record and whether any actions the defendant took at sidebar materially improved her claim that she preserved the issue.

clerk-magistrate's decision declining to issue the defendant's requested complaint against Deng. In fact, by indicating that such a low bar applied to allowing criminal complaints to issue, the judge suggested that the clerk-magistrate must have found the defendant's allegations meritless. Thus, far from curing the problem that the admission of the evidence caused, the instructions actually made the problem worse.

Viewed against the background of the judge's instructions, the testimony about the clerk-magistrate process signaled to the jury that, after hearing from both parties, a judicial official already had determined that Deng's allegations were at least potentially credible, while the defendant's apparently were not.[5] Since this went to the heart of the defendant's defense, we conclude that the defendant has demonstrated a substantial risk of a miscarriage of justice. See Commonwealth v. Foreman, supra (admission of abuse prevention order in assault and battery case stemming from same set of facts created substantial risk of miscarriage of justice).[6] In its appellate brief, the

---

[5] We recognize that the prosecutor did not emphasize the clerk-magistrate's rulings in her closing. However, with the Commonwealth's having persistently pursued this line of questioning during witness examination, we cannot conclude with confidence that the point was lost on the jury.

[6] See also Commonwealth v. Reddy, 85 Mass. App. Ct. 104, 108-111 (2014) (reversing denial of motion for new trial on assault and battery conviction based on allowance in evidence of language in previously-issued restraining order that stated

Commonwealth does not argue that the prejudice effected by the admission of the evidence was minor. Rather, it contends that the admission of the evidence was justified on the grounds that the clerk-magistrate's decision "certainly bears on the defendant's version of events," and that it had "high probative value" that outweighed any undue prejudice. In this manner, the Commonwealth acknowledged the significant potential impact that the evidence could have had on the defendant's case.

2. Sufficiency. Although we have determined that the defendant's conviction must be vacated, for purposes of resolving whether the matter may be retried, we still must address the defendant's argument that the evidence was legally insufficient to support her conviction. Pursuant to G. L. c. 265, § 15A(b), the Commonwealth was required to prove that the defendant engaged in an "intentional and unjustified use of force upon the person of another, however slight." Commonwealth v. Appleby, 380 Mass. 296, 306 (1980), quoting from Commonwealth v. McCan, 277 Mass. 199, 203 (1931). In addition, the battery must be "accomplished by use of an inherently dangerous

_____

"there is a substantial likelihood of immediate danger of abuse"). Cf. Beeler v. Downey, 387 Mass. 609, 610-611 (1982) (ruling inadmissible fact that medical malpractice tribunal had made pretrial determination that plaintiff had shown "a legitimate question of liability appropriate for judicial inquiry" because of its "unquestionably great" potential for unfair prejudice").

weapon,[7] or by use of some other object as a weapon, with the intent to use that object in a dangerous or potentially dangerous fashion."  Id. at 308.  Reading the evidence "in the light most favorable to the Commonwealth, and, 'drawing all inferences in [the Commonwealth's] favor,'" Commonwealth v. Tavares, 471 Mass. 430, 434 (2015), quoting from Commonwealth v. Earle, 458 Mass. 341, 346 (2010), we conclude that there was sufficient evidence to support the defendant's conviction.

There is no question that the evidence was sufficient for the jury to conclude that the defendant intentionally threw the thermos at Deng and in fact hit her with it and its contents. We also conclude that reasonable jurors could have found that the thermos was used "in a dangerous or potentially dangerous fashion" and therefore could qualify as a "dangerous weapon" (even though it is not inherently dangerous).  Commonwealth v. Appleby, supra at 308.  However, the specific dangerous weapon that the defendant was charged with using was the hot water inside the thermos, not the thermos itself.  Based on this, the defendant argues that in two related respects, the evidence was insufficient to prove that she possessed the requisite intent. First, she argues that there was insufficient proof that she knew the thermos contained hot water, and second, she argues

---

[7] The parties agree that a thermos and hot water are not inherently dangerous.

that even if she acted with such knowledge, there was insufficient proof that she intended to cause the hot water to come into contact with Deng. We address these arguments in order.

According to Deng's testimony, which must be credited in our sufficiency analysis, the thermos was full of hot water when the defendant picked it up. In our view, reasonable jurors could have found that once the defendant picked up the thermos, she would have known from its weight that it was at least partially full. See Commonwealth v. Cook, 419 Mass. 192, 203 (1994) (jury may "rely on common experience and common sense in reaching their verdicts"). Moreover, even if the defendant were not able to appreciate the temperature of the thermos's contents merely from handling it, it must be remembered that the defendant confronted Deng while she was in the church kitchen making tea and doughnuts. From these attendant circumstances, jurors reasonably could have inferred that the defendant believed that the liquid in the thermos was hot.

As to the defendant's second argument, the Commonwealth had no obligation to prove that she specifically intended to scald Deng with hot water, or even more generally that she intended to use the hot water as a dangerous weapon. Commonwealth v. Garofalo, 46 Mass. App. Ct. 191, 193 (1999). Assault and battery by means of a dangerous weapon "does not require

specific intent to injure; it requires only general intent to do the act causing injury." Commonwealth v. Appleby, 380 Mass. at 307. "The essential question, when an object which is not dangerous per se . . . is alleged to be a dangerous weapon . . . [is] 'whether the object, as used by the defendant, is capable of producing serious bodily harm.'" Commonwealth v. Tevlin, 433 Mass. 305, 310 (2001), quoting from Commonwealth v. Mercado, 24 Mass. App. Ct. 391, 397 (1987). "[O]nce a jury has found an intentional touching with an object and that the object as used was a dangerous weapon, its work is done." Commonwealth v. Garofalo, supra.

Here, the jury could justifiably find that the defendant's throwing the hot water in a metal and glass container with an unsecured top had the potential to cause serious bodily injury. Moreover, there was evidence, which the jury were entitled to credit, that the defendant's use of the hot water did in fact actually cause such harm. "Of course where [a] neutral object is in fact used to inflict serious injury it would clearly be a dangerous weapon." Commonwealth v. Tarrant, 367 Mass. 411, 416 n.4 (1975). The defendant cannot be heard to complain that her intentional act caused more harm than she claims to have anticipated.[8]

---

[8] Put another way, where the defendant intended to throw the water-filled thermos at Deng, it matters not what precise

3.  Closing argument.  Because we have concluded that the conviction cannot stand on other grounds, we have no need to reach the defendant's remaining claims of error.  However, some comment is warranted on one of those arguments, which may arise in any retrial.[9]  As noted, the prosecutor argued in her summation that members of this church community shared a cultural norm that frowned upon involving outsiders in addressing their problems, and that this norm helped explain "why we don't have 20 to 25 people here from that community telling you exactly what happened in the kitchen that day."  On appeal, the defendant argues that the prosecutor thereby suggested to the jury that she was aware of information to which they were not privy, thereby engaging in improper "vouching." Commonwealth v. Ciampa, 406 Mass. 257, 265 (1989).

As a threshold matter, we agree with the Commonwealth that its claim that such a norm existed in the community was well

_____

pathway caused the water to come in contact with her.  See Commonwealth v. Parker, 25 Mass. App. Ct. 727, 734 (1988) (where defendant assaulted the victim with a lit cigarette and razor blade, there was sufficient evidence even though the victim's injuries apparently were the result of her movements in attempt to escape).  See also Commonwealth v. Barrett, 12 Mass. App. Ct. 1001, 1002 (1981) (contents of object, when object is used in particular manner, can be employed as dangerous weapon).

[9] Although the other remaining claims of error also might arise in a retrial, they are not well suited to appellate review in the current posture of this case (in part because the side bar colloquies were not recorded).

grounded in the testimony adduced at trial.[10]  However, this alone does not mean that the prosecutor's argument based on such evidence was proper.  In a case involving a mutual altercation and competing versions from each combatant, the fact that potential eyewitnesses may have possessed a general reluctance to step forward does not bear on which version of the events was correct.  In any retrial, both counsel should avoid any phrasings that could be taken to suggest that absent eyewitnesses would have supported their respective cases but for those witnesses' reluctance to get involved.

Judgment vacated.

Verdict set aside.

---

[10] The defendant is incorrect in claiming that the prosecutor's argument on this point was supported only by Monykec's testimony.  Rather, the reluctance of members of this community to get outsiders involved was a theme that ran through the testimony of several witnesses.