COMMONWEALTH *vs.* MICHAEL JON SAMPSON.

Middlesex.   March 4, 1981. — June 22, 1981.

Present: HENNESSEY, C.J., BRAUCHER, LIACOS, ABRAMS, & NOLAN, JJ.

*Firearms.   Law or Fact.   Words,* "Firearm," "Weapon."

A flare gun is not a firearm within the meaning of G. L. c. 140, § 121.
    [753-759]
At the trial of a defendant charged with carrying a firearm without a li-
    cense under G. L. c. 269, § 10 (*a*), there was insufficient evidence to
    warrant a finding that the defendant's flare gun was capable of dis-
    charging a shot without malfunction so as to put the gun within the
    proscription of c. 269, § 10 (*a*).   [759-761]
The question whether an instrument which is not a firearm by design is a
    firearm within the meaning of G. L. c. 140, § 121, is a question of law
    and not of fact.   [761]

COMPLAINT received and sworn to in the Lowell Division
of the District Court Department on April 5, 1979.

The case was heard in the Superior Court Department by
*Connolly,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Milly Whatley* for the defendant.

*Pamela L. Hunt,* Assistant District Attorney, for the
Commonwealth.

HENNESSEY, C.J.   The defendant, Michael Jon Sampson,
appeals from his conviction under G. L. c. 269, § 10 (*a*), for
carrying a firearm without a license.   A single justice of the
Appeals Court allowed Sampson's motion for a stay of ex-
ecution of sentence, and we granted direct appellate
review.   We reverse the conviction.

The following evidence was presented at the jury waived
trial in the Superior Court.   While on duty on April 4, 1979,
three Lowell police officers saw a man, whom they recog-

nized as Sampson, enter a sandwich shop. A check with police headquarters confirmed the officers' suspicion that a warrant had been issued for Sampson's arrest.[1] As Sampson left the shop, the officers placed him under arrest and proceeded to search him. In Sampson's shirt pocket they found a United States Navy Projector Signal MK-31 Model O flare gun, loaded with an MK-80 Model O flare cartridge. A second flare cartridge was found in another pocket. The search also revealed five plastic bags containing white pills. During a later inventory search at the police station where Sampson was taken for booking, more white pills were found. Sampson was charged with unlawful possession of a controlled substance with intent to distribute.[2] He was also charged with unlawfully carrying a firearm on his person. Surprised and upset about the firearm charge, Sampson protested: "It is not a firearm. It is only a flare gun." When asked by one of the officers why he was carrying the flare gun, Sampson responded: "If you were in my line of business in this town, you would have something to protect yourself"; "[w]hen you are carrying that much drugs on you in Lowell, you never know when you are going to get robbed or beat on."

The main dispute at trial centered on whether the device found on Sampson fit the statutory definition of "firearm" as "a pistol, revolver or other weapon of any description loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel is less than sixteen inches." G. L. c. 140, § 121, as appearing in St. 1973, c. 892, § 1. Both the Commonwealth and the defendant presented expert testimony on this issue. Testifying for the

---

[1] The confirmation by headquarters was in error. In fact, the arrest warrant was no longer outstanding because Sampson had made the necessary restitution. Sampson showed the officers a court receipt to this effect.

[2] The original complaint charged Sampson with possession of a class B controlled substance with intent to distribute. Before trial the Commonwealth amended this charge to possession of a class E controlled substance with intent to distribute.

Commonwealth was Michael R. Arnold, a State police officer assigned to the firearms identification section. He testified that the flare device, commonly called a "pen gun," measured 6-9/16 inches with the flare cartridge inserted; the cartridge alone measured 2-5/16 inches. Arnold described the test he had conducted to determine whether the device was capable of discharging a shot or bullet. He took an empty tear gas cartridge, which he maintained was interchangeable with the flare cartridge because the threading was the same, and screwed it into the pen gun. He loaded some live shell shot primer into the rear of the empty tear gas cartridge and packed it down with cotton. He then added "a quantity of number 9 lead shot" and packed that down with more cotton. After this preparation, Arnold fired the device without malfunction. He testified that the primer was used solely as a propellant to propel the lead shot. He did not use gunpowder because he would have been "a little leery" of the safety of conducting the test had he done so. In Arnold's opinion, the device was a firearm under G. L. c. 140, § 121.

Appearing for the defense was ballistics expert Chester E. Hallice, Jr., a private investigator formerly employed by the State police. He described how the "flare gun," which he called a "CD signal device," is designed to operate. The base of the flare cartridge is threaded so as to allow it to be screwed into the mouth of the signal device. A knob on the device is pulled back manually. When the knob is released, the spring-controlled firing pin strikes the primer at the base of the cartridge, igniting the propellant inside the cartridge and forcing out the contents of the cartridge. Using his own cartridge and primer, Hallice test-fired the device without malfunction.[3] When asked whether the device was a firearm, Hallice responded: "By law, yes; by design, no." He explained that the device was designed and marked for use

---

[3] Apparently, unlike the preparation for the test-firing conducted by the Commonwealth's expert, no bullet or shot of any kind was inserted by Hallice into the cartridge before firing.

as a signal device, with a flare; but "by law, anything could be a firearm. I could probably go around and lock up every plumber because he carries a barrel length less than 16 inches, and I could make it capable of discharging a shot."

The judge concluded that the instrument in question was a firearm, found Sampson guilty of carrying a firearm without a license, and imposed the mandatory sentence of one year's imprisonment.[4]

On appeal Sampson contends that (1) the signal device found on him is not a firearm within the meaning of G. L. c. 269, § 10 (a), and c. 140, § 121; (2) even if the device is deemed a firearm, insufficient evidence exists to show that he knew or reasonably should have known it was a firearm; and (3) c. 269, § 10 (a), is unconstitutionally vague as applied to his conduct in this case.

The statutory proscription against carrying firearms without a license or other authority, G. L. c. 269, § 10 (a), dates back to 1906, when the Legislature punished the unlawful carrying of a loaded pistol or revolver. St. 1906, c. 172, § 2. The proscription later was broadened to cover the carrying of "a firearm as defined in [c. 140, § 121], loaded or unloaded." St. 1957, c. 688, § 23. "Firearm" is defined in c. 140, § 121, to mean "a pistol, revolver or other weapon of any description loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel is less than sixteen inches or eighteen inches in the case of a shotgun." This definition of firearm, which has prevailed in the Commonwealth since 1911 with little change,[5] may be broken down into three requirements: the instrument in question must be (1) a weapon, (2) capable of discharging a shot or bullet, and (3) under a certain length.

The first question is whether the signal device found on the defendant is a weapon for purposes of the statute. The

---

[4] Sampson was also found guilty of the drug violation and received a one year from-and-after sentence, which was suspended for three years.

[5] The only difference between the current definition and that contained in the statute as first enacted is the requisite barrel length, which originally was set at twelve inches. St. 1911, c. 495, § 1.

simplest definition of weapon is "something to fight with." Webster's New Int'l Dictionary 2892 (2d ed. 1959). A weapon is "an instrument of offensive or defensive combat; . . . anything *used, or designed to be used,* in destroying, defeating, or injuring, an enemy" (emphasis added). *Id.* The distinction between instruments that are weapons by design and those that become weapons because they are used as such was explained recently in *Commonwealth* v. *Appleby,* 380 Mass. 296, 303-305 (1980), involving a prosecution for assault and battery by means of a dangerous weapon. In *Appleby,* we classified as weapons "dangerous per se" (i.e., dangerous by design) those "instrumentalit[ies] designed and constructed to produce death or great bodily harm," such as "firearms, daggers, stilettos and brass knuckles, [which] . . . are designed for the purpose of bodily assault or defense." *Id.* at 303. An instrument that is not a weapon by design may nonetheless become one by the manner in which it is used. ("[R]azors, hammers, wrenches and cutting tools," all of which have legitimate, ordinary uses, may be classified as dangerous weapons when used as such. *Id.*) See, e.g., *Commonwealth* v. *Farrell,* 322 Mass. 606, 614-615 (1948) (lighted cigarette is dangerous weapon when used to burn human flesh).

The flare device at issue here is not a weapon by design. The purpose of the device is to enable boat operators to send visual distress signals to expedite rescue efforts. Devices suited for such a purpose, including hand-held red flare distress signals, are required by the United States Coast Guard on certain classes of boats. See Navigation and Navigable Waters, 33 C.F.R. §§ 175.110, 175-130 (1980); 45 Fed. Reg. 45,269 (1980) (to be codified in 33 C.F.R. § 175.130). The signal device thus has a legitimate, noncombative design and purpose.[6] Granted, as is true with

---

[6] In contrast to signal flare devices, tear gas guns are weapons by design, in that their purpose is to subdue or incapacitate temporarily. In cases involving convictions under firearms statutes for unlawfully carrying or using tear gas guns, the issue has been not whether the instrument was a weapon, but whether it was a weapon sufficiently capable of dis-

many objects that are not weapons by design, the device could be characterized as a weapon if it were so used. In the case before us, however, the device was not used at all, either as a weapon or otherwise; the offense charged is simply one of carrying, not using.

The Commonwealth makes much of Sampson's allusions to his potential use of the device for protection.[7] The question before us then becomes: Should a device that is neither designed nor actually used as a weapon be deemed a weapon that must be licensed because its owner intends to use it as a weapon at some time in the future? We think not. In a licensing scheme that depends on obtaining legal permits in advance, the definition of the object subject to licensing should be construed, as much as is feasible, in a manner that does not require looking into the subjective intent of the potential licensee. We do not believe that the Legislature intended an object's character as a "weapon" under c. 140, § 121, to turn on its intended use as a weapon. Rather, the focus in the legislative regulatory scheme seems to be on those instruments and materials that are designed to injure or incapacitate. The same statute that regulates the carrying of firearms forbids the carrying of instruments such as stilettos, blackjacks, and metallic knuckles, all of which are dangerous by design. G. L. c. 269, § 10 (b). See

charging explosives or bullets so as to come within the applicable statutory or common law definition of firearm. See, e.g., United States v. Decker, 292 F.2d 89 (6th Cir.), cert. denied, 368 U.S. 834 (1961); Howell v. State, 278 Md. 389 (1976); State v. Umbrello, 106 N.H. 336 (1965); People v. Anderson, 236 App. Div. 586 (N.Y. 1932); Wall v. Zeeb, 153 N.W.2d 779 (N.D. 1967). Similarly, the opinion of the Attorney General that a tear gas pen gun is a firearm focused on the gun's ability to discharge a shot or bullet, as required by c. 140, § 121. Rep. A.G., Pub. Doc. No. 12, at 263 (1965). We note that after this opinion was issued, the Legislature enlarged the scope of the definition of ammunition in c. 140, § 121, to include tear gas cartridges, St. 1973, c. 892, § 1, and added a specific prohibition against the use of tear gas cartridges for the purpose of committing a crime. G. L. c. 269, § 10C, as appearing in St. 1973, c. 892, § 9.

[7] As is apparent from the facts at trial, however, any such intended use by Sampson would involve discharging the flare cartridge, and not a "shot or bullet" as required by c. 140, § 121.

*Commonwealth* v. *Appleby, supra* at 303. The same section that defines firearm defines ammunition to mean not only conventional ammunition, such as bullets, "designed for use in any firearm, rifle or shotgun," but also "tear gas cartridges, chemical mace, or any device or instrument which contains or emits a liquid, gas, powder, or any other substance *designed to incapacitate*" (emphasis added). G. L. c. 140, § 121.

Other State courts construing the word "weapon" in statutes penalizing the carrying (as opposed to the use) of dangerous weapons have concluded that the statutory prohibition applies only to instruments that are weapons by design. See, e.g., *State* v. *Rackle,* 55 Haw. 531 (1974); *State* v. *Nelson,* 38 La. Ann. 942 (1886); *State* v. *Page,* 15 S.D. 613 (1902). These cases have rejected the suggestion that the use to which an instrument might be put, rather than the purpose for which it was designed, should determine its character as a weapon.[8] In *State* v. *Rackle, supra,* the Supreme Court of Hawaii reversed a conviction for carrying a flare gun containing a phosphorous cartridge, under a statute prohibiting the carrying of pistols, dirks,

---

[8] The statute at issue in *State* v. *Page,* 15 S.D. 613, 615-616 (1902), punished rioting as a misdemeanor, but made it a felony if the rioting defendant was carrying a firearm or other dangerous weapon. Because no use of the weapon was required for the greater offense, the court held that the statutory term "weapon" covered only instruments designed for offense or defense of persons, and refused to extend it to include ordinary instruments (such as the driving whip at issue) not actually used for combative purposes. *State* v. *Nelson,* 38 La. Ann. 942 (1886), involved a statute prohibiting the carrying of any concealed weapon "such as bowie-knives, pistols, dirks, or any other dangerous weapon." The defendant was convicted for carrying a razor. The trial judge had found that even though not designed as a dangerous weapon, a razor could be within the statutory prohibition if carried as a weapon by the defendant. *Id.* at 943. Rejecting this interpretation, the Supreme Court of Louisiana viewed the statute as prohibiting only the carrying of a weapon "eo nomine," one dangerous per se. "We do not regard the particular purpose to which the instrument [may be] applied, as exercising control over its *character* as a weapon" (emphasis in original). *Id.* at 944. Conceding that a razor might be a weapon if used to fight with, the court nonetheless emphasized that the statute did not denounce instruments that might be used to harm somebody. *Id.* at 945-946.

daggers and other deadly or dangerous weapons. The court reasoned that the fact that some instruments might well be used as weapons did not mean that the Legislature intended to punish persons for carrying them. *State* v. *Rackle, supra* at 535-537. "[I]t would be anomalous to hold that an instrument which is not designed as an offensive weapon is deadly or dangerous within the meaning of [the statute]. An ordinary flare gun is not designed or intended to be used as a weapon." *Id.* at 537.[9]

Had the Legislature intended to embrace within the definition of firearm devices other than those that are weapons by design, it could have used more general terminology, as has been done by Legislatures in other jurisdictions. In the National Firearms Act, for example, Congress has defined firearm so as to include "any weapon *or device* capable of being concealed on the person from which a shot can be discharged through the energy of an explosive." 26 U.S.C. § 5845(a)(5), (e) (1976) (emphasis added). See, e.g., *United States* v. *Coston*, 469 F.2d 1153 (4th Cir. 1972) (holding within the § 5845 definition of Blair flare gun which the defendant had loaded with a shotgun shell and which was shown by test-firing to be capable of being used as a shotgun).[10]

---

[9] Compare *People* v. *Evergood*, 74 N.Y.S.2d 12 (City Ct. 1947), in which a City Magistrates' Court held that a World War I Navy Very pistol, designed to fire warning flares, constituted a weapon and hence a firearm subject to licensing, because the pistol, even though not designed as a weapon, was capable of being used as a weapon and in fact was so used (by a burglar who broke into the defendant's house, loaded the pistol with shotgun shells, and used it to kill a policeman). The court believed its conclusion was compelled by *People* v. *Anderson*, 236 App. Div. 586 (N.Y. 1932), which held that a tear gas pistol constituted a firearm because it could fire bullets, even though it was not designed to fire bullets. The question in *Anderson*, however, was not whether the tear gas pistol was a weapon, but rather whether it was a weapon capable of firing bullets. See note 6, *supra*.

[10] The National Firearms Act also regulates "destructive device[s]," which include bombs, grenades, and "any type of weapon . . . which will, or which may be readily converted to, expel a projectile by the action of an explosive." 26 U.S.C. § 5845(a)(8)(f)(1976). Apparently anticipating the problem at issue in cases such as this, where an instrument is not a weapon by design but may be used as such, Congress specifically excluded

That the Legislature intended to put flare devices on a
different footing from weapons and other destructive instru-
mentalities is evident from the fact that such devices are ex-
empted from the requirement that the possessor of firearms
obtain a firearm identification card, c. 140, § 129C (a) (ex-
empting "[a]ny device used exclusively for signalling or
distress use and required or recommended by the United
States Coast Guard").[11]   The Commonwealth argues that
this specific exemption indicates a legislative intent to have
such devices included within the general definition of fire-
arm.   But an examination of the entire firearm regulatory
scheme reveals that peculiar consequences would result
from a conclusion that flare devices are firearms — conse-
quences that we are reluctant to assume to have been in-
tended by the Legislature.   Although no firearm identifica-
tion card would be required to possess a flare device, see
c. 140, § 129(C) (a), supra, a prospective owner would still
need to obtain a permit to purchase under §§ 131A, 131E;
and a seller would be prohibited from selling to anyone
without such a permit, § 123, Eighth.   Yet we assume, and
we think rightly, that currently in this Commonwealth flare
devices are freely available to all who wish to purchase
them.   Moreover, if a flare device were deemed a firearm, a
license to carry would be necessary if the owner wished to
take it outside his home or business.   See c. 140, § 129C. See
generally *Commonwealth* v. *Seay*, 376 Mass. 735, 738-742
(1978).   Given these practical consequences and the ordi-
nary, noncombative purpose of flare devices, we fail to find
a sufficiently clear legislative intent to include them as
weapons so as to subject their sale, possession, and carrying

from the term "destructive device" "any device which is neither designed
nor redesigned for use as a weapon" as well as "any device, although
originally designed for use as a weapon, which is redesigned for use as a
signalling, pyrotechnic, line throwing, safety, or similar device." *Id.*

[11] A similar exception for flares is contained in the statute proscribing
possession and sale of fireworks, G. L. c. 148, § 39, as well as in the
statute punishing the possession of breakable containers of flammable liq-
uids or devices which, when thrown, cause a fire or explosion, G. L.
c. 266, § 102B.

to the same regulation and penalties as that provided for instruments that are weapons by design. Cf. *Commonwealth v. Krasner,* 351 Mass. 648 (1967).[12]

Even were we to assume the flare device here constituted a weapon, we would hesitate to conclude that it has been proven to be capable of discharging a shot or bullet within the meaning of c. 140, § 121, and c. 269, § 10 (c). The proscription against carrying applies to working firearms only. *Commonwealth v. Dunphy,* 377 Mass. 453, 456 (1979). *Commonwealth v. Seay,* 376 Mass. 735, 737 (1978). *Commonwealth v. Colton,* 333 Mass. 607 (1956). *Commonwealth v. Bartholomew,* 326 Mass. 218 (1950). As the expert testimony at trial indicated, some preparation was required to enable the flare device to discharge a shot. We are offered widely different characterizations of the nature and degree of preparation necessary. According to the defendant, the adaptation constituted a sophisticated and major alteration by a trained ballistics expert. Although we tend to agree with the Commonwealth's characterization of the adaptation as relatively minor, certain aspects of the testing process trouble us. No gunpowder was used, apparently because of the risk of harm to the person test-firing; yet such a risk would seem to pose the same deterrent to the use of the device as a firearm by anyone else sufficiently versed in the mechanics of guns to perform the necessary adaptation. And it is only the potential danger of the device as a *firearm* (i.e., a weapon capable of firing shots or

---

[12] In *Commonwealth v. Krasner,* 351 Mass. 648 (1967), the defendant was convicted of having exploded a composition "prepared for the purpose of producing a visible or audible effect by combustion, explosion, deflagration or detonation," in violation G. L. c. 148, § 39. In refusing to extend the statute to include the tear gas projector discharged by the defendant, this court explained that "[i]t is the purpose for which the device is manufactured . . . which is controlling, not the purpose for which [it] is used." *Id.* at 650. Noting that the intent of c. 148, § 39, "is to proscribe the use of certain fireworks and related devices," we declined "to expand the scope of the statute to include a device which is not within the general description of 'fireworks' set out in [the] statute, even though such a device may have some of the characteristics of fireworks and conceivably may be just as dangerous." *Id.* at 649.

bullets) that c. 269, § 10 (*a*), was designed to guard against. See *Commonwealth* v. *Jackson*, 369 Mass. 904, 919 (1976); *Commonwealth* v. *Bartholomew, supra* at 219.[13] The use of gunpowder or other explosive during the test-firing of the flare device might have required more substantial or elaborate alteration[14] and might have resulted in the device rupturing or misfiring in other respects. When faced with the issue of whether weapons such as tear gas guns were capable of firing shots so as to be firearms encompassed by licensing laws, courts have focused on whether there was sufficient proof of test-firing without substantial alteration and without rupturing the barrel or causing any structural damage. See *United States* v. *Decker*, 292 F.2d 89, 90 (6th Cir.), cert. denied, 368 U.S. 834 (1961); *Howell* v. *State*, 278 Md. 389 (1976); *State* v. *Umbrello*, 106 N.H. 336 (1965). Nor does the record indicate how far or how fast the shot was propelled; for all that appears, the shot may have barely dribbled out of the tear gas cartridge. Cf. *People* v. *Anderson*, 236 App. Div. 586, 588 (N.Y. 1932) (expert discharged from tear gas pen gun a .38 caliber cartridge and .30 caliber Lueger cartridge into a 3/4 inch board sixteen to eighteen inches away, penetrating the board; he estimated

[13] Cf. *United States* v. *Decker*, 292 F.2d 89, 90 (6th Cir. 1961) (observing that a weapon constitutes a firearm under what is now 26 U.S.C. § 5845(e) (1976) only if it can discharge shot through the energy of an explosive; "a tear gas gun capable only of discharging tear gas would not be considered as a firearm"); *Howell* v. *State*, 278 Md. 389, 396 (1976) (concluding that to be a firearm, tear gas pistol "must propel a missile by gunpowder or some such similar explosive"; tear gas itself does not constitute missile).

[14] In *Commonwealth* v. *Bartholomew*, 326 Mass. 218 (1950), we held that the absence of a firing pin did not destroy the character of the weapon in question as a "machine gun" under G. L. c. 140, § 121, because although "it may be conceded that a weapon designed for firing projectiles may be so defective or damaged that it has lost its initial character as a firearm, . . . this character is not lost when a *relatively slight repair, replacement, or adjustment* will make it an effective weapon." *Id.* at 219-220 (citation omitted) (emphasis added). In *Bartholomew*, however, as in *Commonwealth* v. *Colton*, 333 Mass. 607 (1956), and unlike the situation here, no question existed as to the "initial character" of the machine gun as a firearm.

that shot would travel 800 to 900 feet upon discharge, and that it would go through a human body).

Given these deficiencies in the testing process, even were we to characterize the flare device as a weapon, we would be hard put to hold that it was proven to be sufficiently capable of discharging a shot without malfunction so as to come within the proscription of c. 269, § 10 (a).

In reaching the conclusion that the flare device is not a firearm, we reject the suggestion that whether the device falls within the statutory definition is strictly a question of fact, here decided adversely to the defendant by the fact finder below. Although we have often stated that whether a gun is a firearm under c. 140, § 121, is a question of fact for the jury, we have done so in the context of conventional firearms only, when either the firing capability of the gun or the length of its barrel was at issue. *Commonwealth* v. *Bartholomew, supra* at 222 (machine gun). *Commonwealth* v. *Fancy,* 349 Mass. 196, 204 (1965) (revolver). *Commonwealth* v. *Sperrazza,* 372 Mass. 667, 670 (1977) (revolver). See *Commonwealth* v. *Stallions,* 9 Mass. App. Ct. 23 (1980) (revolver). Whether a weapon satisfies the physical requirements of c. 140, § 121, is indeed a factual determination for the jury. In a situation involving instruments that are not firearms by design, however, when the issue is whether the item in question may be deemed a "weapon" subject to regulation, a question of law is presented. See, e.g., *State* v. *Nelson,* 38 La. Ann. 942, 944 (1886); *State* v. *Page,* 15 S.D. 613, 616 (1902); *Barboursville* v. *Taylor,* 115 W. Va. 4, 7 (1934) (noting that whether an implement *used* in an assault is a dangerous weapon may be a question of fact, but when the offense charged is the unlawful *carrying* of a weapon the question whether a particular item is proscribed is to be decided by the court). Cf. *Commonwealth* v. *Appleby,* 380 Mass. 296, 303-305 (1980).

Our conclusion that the flare device is not a firearm requires reversal of the defendant's conviction. Although this makes it unnecessary to resolve the issues raised by the defendant's remaining contentions, we note that a substantial

question whether the defendant's possession was "knowing"[15] would be presented were we to hold that the flare device constituted a firearm. See *United States* v. *Freed*, 401 U.S. 601, 607, 609-610 (1971), and concurring opinion by Brennan, J.; *United States* v. *DeBartolo*, 482 F.2d 312 (1st Cir. 1973). Even though the government need not prove that a defendant knows he is carrying a firearm whose physical characteristics, such as barrel length, render it subject to regulation, we think it should be required to prove that he knows the instrument is a firearm within the generally accepted meaning of that term. See *United States* v. *Vasquez*, 476 F.2d 730, 732 (5th Cir.), cert. denied, 414 U.S. 836 (1973). This is the prevailing Federal rule in prosecutions for unlawful possession or transfer of firearms under the National Firearms Act. See *United States* v. *Woodruff*, 600 F.2d 174, 176 (8th Cir. 1979), and cases cited;[16] *United States* v. *Ranney*, 524 F.2d 830, 832 (7th Cir. 1975), cert. denied, 424 U.S. 922 (1976); *United States* v. *Cowper*, 503 F.2d 130, 131 (6th Cir. 1974), cert. denied, 420 U.S. 930 (1975). Cf. *Commonwealth* v. *Bacon*, 374 Mass. 358, 361

---

[15] In order "to avoid possible constitutional doubts," we have interpreted c. 269, § 10 (a), to require "proof that the accused knew that he was carrying a firearm." *Commonwealth* v. *Jackson*, 369 Mass. 904, 906 (1976). We have never elaborated on the requirements of knowledge other than in the context of the defendant's knowing *possession or carrying* of a conventional firearm. See *Commonwealth* v. *Almeida*, 381 Mass. 420, 422 (1980), and cases cited.

[16] The following rationale as to the knowledge requirement in prosecutions for violations of the National Firearms Act was extracted by the First Circuit Court of Appeals from the Supreme Court's opinions in *United States* v. *Freed*, 401 U.S. 601 (1971), and *United States* v. *International Minerals and Chem. Corp.*, 402 U.S. 558 (1971); "The Government need not prove that a defendant knows he is dealing with a drug or a weapon possessing every last characteristic which subjects it to regulation. It is enough to prove he knows that he is dealing with a dangerous device of such type as would alert one to the likelihood of regulation. If he has such knowledge, and if the particular item is in fact regulated, he acts at his peril. A shotgun in today's society plainly falls within this category." *United States* v. *DeBartolo*, 482 F.2d 312, 316 (1st Cir. 1973). Whether a flare device falls within that category is not so plain. Certainly, many people buy and sell flare devices oblivious of the potential existence of regulation.

(1978) ("the characteristics of a gun are obvious. . . . [A]ll an accused need know is that he is carrying a gun"). The evidence at trial indicated that the defendant did not believe the flare device he carried constituted a firearm within the generally accepted meaning of the word;[17] nor would most people consider it as such.

We recognize the potential dangers from the use of flare devices as weapons. Such use certainly could justify prosecution for a number of offenses, including assault, battery, and related crimes. The defendant in this case, however, was not prosecuted for using the flare device, but simply for carrying it. Although the Legislature may have power to regulate the carrying of flare devices,[18] we fail to find an intention to do so in the statute regulating the carrying of firearms, G. L. c. 269, § 10 (a). The case is remanded for reversal of the conviction on the firearm indictment and entry of a judgment of not guilty.

*So ordered.*

---

[17] The defendant's stated purpose for carrying the flare device — for protection — is insufficient to prove that he knew or reasonably should have known that the device was a firearm; his statements prove only that he knew he carried an object capable of use as a weapon.

[18] Such regulation would, of course, have to take into account the existence of Federal laws requiring boats to be equipped with distress flares. See Navigation and Navigable Waters, 33 C.F.R. §§ 175.110, 175.130 (1980); 45 Fed. Reg. 45,269 (1980) (to be codified in 33 C.F.R. § 175.130).