COMMONWEALTH vs. THOMAS R. RAEDY.

Plymouth. January 14, 1987. — August 31, 1987.

Present: PERRETTA, QUIRICO, & KASS, JJ.

*Search and Seizure*, Automobile. *Constitutional Law*, Search and seizure. *Practice, Criminal*, Instructions to jury. *Firearms*. *Words*, "Firearm."

In a criminal case, the judge correctly denied the defendant's motion to suppress as evidence a handgun found under the driver's seat of the vehicle the defendant had been operating when he was stopped by police for speeding and arrested on outstanding warrants, where the evidence at the hearing on the motion clearly demonstrated that the police had lawfully seized the gun when it came into view during a valid inventory search conducted to secure the vehicle for towing. [651-652]

At the trial of a complaint alleging a violation of G. L. c. 269, § 10(*a*), expert testimony that a small .25 calibre semiautomatic handgun could be fired once in an inverted position, even though repairs were necessary to safely engage the firing pin in the usual manner, was sufficient evidence upon which to submit to the jury the issue whether the handgun was a firearm as defined in G. L. c. 140, § 121. [652-654]

At the trial of a complaint alleging violation of G. L. c. 269, § 10(*a*), the judge correctly declined to instruct the jury that the Commonwealth had the burden of proving that the defendant had the knowledge and ability to make the repairs necessary to render the handgun in issue safely operable, where there was evidence that the handgun could be fired without repair, and where the issue whether any repairs necessary were major or minor was for the jury to consider. [654-656]

At the trial of a complaint alleging a violation of G. L. c. 269, § 10(*a*), there was no error in the circumstances in the judge's declining to instruct on the offense of possession of a firearm in violation of G. L. c. 269, § 10(*h*). [656]

COMPLAINT received and sworn to in the Hingham Division of the District Court Department on October 12, 1984.

On transfer to the jury session of that court, the case was tried before *Charles E. Black*, J.

*Donald A. Harwood* for the defendant.

*John P. Corbett,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On appeal from convictions on complaints charging him with unlawfully carrying a firearm (G. L. c. 269, § 10 [a]) and various motor vehicle violations, the defendant . directs all his arguments to the firearm conviction. He claims that the gun was illegally seized from his car after he was stopped for speeding, that the Commonwealth failed to prove that the gun was a weapon from which a shot or bullet could be discharged, and that the jury instructions concerning the firing capability of the gun were erroneous. We conclude that the gun was seized in the course of a valid inventory search and that, because there was evidence to show that the gun could be discharged at least once without repair or adjustment, the Commonwealth sustained its burden of proof. Finding no error in the jury instructions or the denial of his motion for a new trial, we affirm.

I. *Seizure of the Gun.*

In denying the defendant's motion to suppress, the judge made no findings of fact. We think, however, that the reasons for his ultimate conclusion are "clearly evident from the record." *Commonwealth* v. *Parham,* 390 Mass. 833, 837-838 (1984); *Commonwealth* v. *Lanoue,* 392 Mass. 583, 586 n.2 (1984). The evidence adduced at the suppression hearing is as follows.

. On February 20, 1984, at about 11:40 P.M., Hingham police officer John Norkaitis saw the defendant speeding.[1] He followed him and signalled for him to pull over. Norkaitis pulled over behind the defendant's vehicle and noted that the defendant, who was alone, was moving about the front seat more than what Norkaitis regarded as "normal." Norkaitis asked the defendant for his registration and driver's license. The defendant produced his registration but explained that, although he had a driver's license, it was not in his possession.

---

[1] The defendant was driving about seventy to seventy-five miles an hour.

Norkaitis asked the defendant to get out of the automobile and when he complied, Norkaitis conducted a "pat-down" search. He advised the defendant to get back into his vehicle and wait. Returning to his cruiser, Norkaitis called into police headquarters and made two inquiries; did the defendant have a valid driver's license and were there any outstanding warrants for his arrest? He was advised that the defendant had a driver's license and that there were two outstanding warrants for motor vehicle violations.

About this time, Officer Pedro Vidal arrived upon the scene. He and Norkaitis discussed the situation, and then Norkaitis returned to the defendant's vehicle and asked that he get out. He advised the defendant that he was being placed under arrest on the outstanding warrants. He conducted another "pat-down" search, handcuffed the defendant, and escorted him to his cruiser to transport him to police headquarters.

When Norkaitis left, Vidal remained behind to arrange for and await the arrival of a truck to tow the defendant's car. The defendant had left the engine to his car running, and Vidal got into the defendant's vehicle to turn the engine off and secure it for towing in accordance with the standard procedure of the Hingham police department.

As described by Vidal, that policy and procedure requires: "[A]n inventory search will be done upon a person being arrested . . . . The vehicle will be searched, the ignition key removed, the keys on the ring will be returned other than the ignition key and everything will be taken note of." When Vidal got into the driver's seat of the defendant's automobile to turn off the engine and remove all the keys except the ignition key from the key ring, he saw a "shiny, metallic" object protruding from under the driver's seat directly under his feet.

Pulling the object forward, Vidal discovered that it was a hammer. There was a small semiautomatic handgun attached to the hammer claw. Vidal returned to his cruiser to call to Norkaitis to see if he had done a thorough "pat-down" of the defendant.[2]

---

[2] Vidal told Norkaitis that the had found a gun in the car. In response to questions from Norkaitis, the defendant said that the gun belonged to him,

Norkaitis informed Vidal that he had, and Vidal returned to the defendant's vehicle. In the course of his search, Vidal found a "lot of tools in the car, but no contraband."

In arguing that his motion to suppress should have been allowed, the defendant contends that because the gun was not seized pursuant to a search incident to an arrest or a search based upon probable cause, because there were no exigent circumstances, and because the gun was not in the officer's plain view,[3] there was no justification for the seizure of the gun. The Commonwealth argues, however, that the only theory it has ever advanced in support of the seizure of the gun is that it came into Vidal's plain view in the course of a valid storage or inventory search conducted to secure the car for towing. The defendant's response to the Commonwealth's position is that that theory was never presented to the motion judge and, moreover, that Vidal conceded that the Hingham police department had no standard written policy on inventories.

Our reading of the suppression hearing transcript shows the defendant in error on both points. In final argument on the motion, the Commonwealth made its theory clear, even if in less than eloquent terms. Vidal's testimony is equally clear. The Hingham police department has a policy concerning the procedure to be followed in securing a vehicle. He did not know whether that policy and the procedures were presently

that he got-it "on the street," and that he did not have a license to carry. He amended the latter statement by saying that a town had authorized a license for him but he had yet to go and get it. Although the defendant lodged an objection to this conversation, no argument is made on appeal concerning the admissibility of these statements, other than a conclusory remark that they must be suppressed as they are the fruits of the poisonous tree.

[3] In arguing that the seizure of the gun cannot be justified under the plain view doctrine, the defendant contends that Vidal had no right to enter the defendant's car and that even after he did, he did not come upon the gun inadvertently. The contention is that he found it while conducting an exploratory search. See *Coolidge* v. *New Hampshire,* 403 U.S. 443, 465-466 (1971); *Commonwealth* v. *Rand,* 363 Mass. 554, 557-558 (1973); *Commonwealth* v. *Accaputo,* 380 Mass. 435, 447-448 (1980); *Commonwealth* v. *Toole,* 389 Mass. 159, 161-162 (1983); *Commonwealth* v. *Woodman,* 11 Mass. App. Ct. 965, 966 (1981).

in written form. However, when Vidal became a member of the police department (at the time of his testimony Vidal had been a police officer for eleven years), there was a written policy and he had "followed it since."

In the circumstances of this case, we see no illegality in the officers' actions, including Vidal's seizure of the gun. "The Supreme Court of the United States has held that an inventory search of an impounded motor vehicle is not unreasonable under the Fourth Amendment to the Constitution of the United States if carried out in accordance with standard procedures and if there is no suggestion that the procedure was a pretext concealing an investigatory police motive. See *South Dakota* v. *Opperman*, 428 U.S. 364, 376 (1976). Such inventories reasonably may be considered necessary for the purpose of protecting the car or its contents, for the purpose of protecting the police against unfounded charges of misappropriation of such property, for the purpose of protecting the public against the possibility that the car might contain weapons or other dangerous instrumentalities which might fall into the hands of vandals, or for a combination of such reasons. *Id.* at 369." *Commonwealth* v. *Matchett*, 386 Mass. 492, 509-510 (1982). See and compare, *Commonwealth* v. *White*, 374 Mass. 132, 140-141 (1977); *Commonwealth* v. *Benoit*, 382 Mass. 210, 219-220 (1981); *Commonwealth* v. *Ford*, 394 Mass. 421, 424-425 (1985); *Commonwealth* v. *Woodman*, 11 Mass. App. Ct. 965, 966 (1981). See generally, Smith, Criminal Practice and Procedure §§ 273, 274 (2d ed. 1983), and 2 La Fave, Search and Seizure § 7.4, at 576-577 (1978 & Supp. 1984), cited in *Commonwealth* v. *Ford*, 17 Mass. App. Ct. 505, 509 (1984), *S.C.,* 394 Mass. 421 (1985).

II. *Firing Capability of the Gun.*

To constitute a "firearm" within the meaning of G. L. c. 140, § 121, and hence within the prohibition of G. L. c. 269, § 10(a), the "instrument in question must be (1) a weapon, (2) capable of discharging a shot or bullet, and (3) under a certain length." *Commonwealth* v. *Sampson*, 383 Mass. 750, 753 (1981). The defendant argues that the Commonwealth failed to present sufficient evidence from which the jury could find that the weapon had firing capability and was, therefore, a firearm. See *Commonwealth* v. *Bartholomew*, 326 Mass. 218, 222 (1950).

The firearm in question is a small .25 calibre semiautomatic handgun. When retrieved by Vidal, the gun was loaded with a clip containing five or six rounds of ammunition. The clip was held in place with scotch tape. To show the weapon was operable, the Commonwealth offered the testimony of State police officer Michael Arnold. At the time of trial, Arnold had had nine years experience with the State police in the firearms identification section. His expertise and duties included the "preservation" of firearms evidence as well as physical and microscopic examinations of firearms and firearms-related evidence.

Arnold testified that to operate the firearm in question in the manner in which a gun is intended to be used, a "minor" repair first had to be made: the sear spring on the gun was incorrectly aligned. Until the spring was repaired by putting it in its proper position, pressure could not be applied to the sear which engages the firing pin. The repair, according to Arnold, could easily be made by someone who was familiar with or owned the weapon. Moreover, directions for the repair could be found in the manual that is provided with the gun at the time of purchase.

Arnold did not test fire the gun in its unrepaired state for the following reason: "[Y]ou would have probably caused damage to the pistol with the spring out of alignment and as a safety factor, I wouldn't want to be jiggling the gun around with a live round in the chamber in my office trying to get the pistol to cock unless there was an absolute specific reason to do that and I didn't have a reason to do it." The defendant argues that Arnold's testimony brings the case within *Commonwealth* v. *Sampson,* 383 Mass. at 759 ("the risk of harm to the person test-firing . . . would seem to pose the same deterrent to the use of the device as a firearm"), and *Commonwealth* v. *Rhodes,* 21 Mass. App. Ct. 968, 969 (1986) ("there was no evidence sufficient to justify an inference that the defendant was sufficiently skilled to repair the weapon, or that an untrained user of a pistol could make the repair").

In *Sampson,* however, the instrument in question was a flare gun and without test-firing that instrument it could not be

determined whether it was a "weapon" as defined in G. L. c. 140, § 121. In *Rhodes,* the evidence established that the weapon could not be fired at all without first being repaired. In the present case there was evidence, Arnold's testimony, that without first being repaired, the gun could be fired (a bullet discharged) at least once "by inverting it" that is, the gun could be fired "upside-down." As we read the first sentence of G. L. c. 140, § 121, as appearing in St. 1983, c. 516, § 1, the gun in question is a "firearm," that is, a "weapon . . . from which a shot or bullet can be discharged." Even if the gun could be discharged but once in an inverted position, one bullet can inflict that harm which G. L. c. 269, § 10(*a*), was designed to prevent. See *Commonwealth* v. *Jackson,* 369 Mass. 904, 919 (1976). The evidence was sufficient to put to the jury, with appropriate instruction, the question whether the gun was a firearm. See *Commonwealth* v. *Bartholomew,* 326 Mass. at 222.[4]

III. *The Jury Instructions.*

We see no error in the trial judge's instructions concerning the firing capability of the weapon. In *Commonwealth* v. *Bartholomew,* 326 Mass. at 220, the court stated: "While it may be conceded that a weapon designed for firing projectiles may be so defective or damaged that it has lost its initial character as a firearm [citation omitted], this character is not lost when a relatively slight repair, replacement, or adjustment will make it an effective weapon." The firing capability of a weapon is usually a question of fact left for the jury under appropriate instructions. *Id.* at 222. See also *Commonwealth* v. *Fancy,* 349 Mass. 196, 204 (1965); *Commonwealth* v. *Sperrazza,* 372 Mass. 667, 670 (1977); *Commonwealth* v. *Stallions,* 9 Mass. App. Ct. 23, 25-26 (1980). Contrast *Commonwealth* v.

---

[4] As an additional ground for his motion for a directed verdict, the defendant claims that the Commonwealth failed to show that the defendant knew that the gun was in the car. The defendant was the sole occupant of the car. The firearm, which he acknowledged to be his (see note 2, *supra*), was found under the driver's seat. Viewing the evidence in a light most favorable to the Commonwealth, we conclude that the trial judge properly submitted the issue of the defendant's knowledge to the jury. See *Commonwealth* v. *Albano,* 373 Mass. 132, 135 (1977).

*Sampson,* 383 Mass. at 761 ("In a situation involving instruments that are not firearms by design, however, when the issue is whether the item in question may be deemed a 'weapon' subject to regulation, a question of law is presented"). Here, there was no question whether the "instrument" was a firearm. The issue was whether it could fire or discharge a bullet. The trial judge instructed in substantial accordance with the principle of *Commonwealth* v. *Bartholomew,* 326 Mass. at 220.

There was competing evidence from the Commonwealth's and the defendant's experts as to whether the repairs needed to make the gun operable in the normal fashion were minor or major.[5] Both explained and demonstrated to the jury what was required to repair the gun. The defendant argues that, under the reasoning of *Commonwealth* v. *Sampson,* 383 Mass. at 759, and *Commonwealth* v. *Rhodes,* 21 Mass. App. Ct. at 969,[6] it was error to refuse to instruct the jury, in effect, that the Commonwealth had the burden of proving that this particular defendant had the requisite knowledge and ability to make the repairs to render the gun operable without risk of harm to the person firing the weapon.

Neither the evidence nor the law supports a defendant's argument. In the first instance, the evidence shows that there was an issue whether the gun could be fired without risk if the gun were not first repaired. There was, however, also evidence that the gun could be fired, risk free, without repair if it were inverted or if a stick or nail were used to trip the sear. Contrast *Commonwealth* v. *Sampson,* 383 Mass. at 759. Further, unlike the present case, in *Commonwealth* v. *Rhodes,* 21 Mass. App. Ct. at 969, the evidence was that the "pistol could *not* be fired" (emphasis original) without first making the repairs therein described, and there was no evidence to show whether the

---

[5] We have described the testimony of the Commonwealth's expert. The defendant's witness testified that without repairs, the gun might possibly be fired right-side up by "tripping" the sear with a stick or nail. In his opinion, the repairs needed to make the gun operable without such "tripping" were major.

[6] We note (without reliance upon the fact) that *Rhodes* was decided a year after the defendant's trial.

defendant or "an untrained user of a pistol could make the repair." *Ibid.* We see nothing in G. L. c. 269, § 10(*a*), in *Sampson,* or in *Rhodes* which mandates that the Commonwealth prove and the jury find that this particular defendant possessed the ability and knowledge to repair the gun. The "objective" and "subjective" distinction insisted upon by the defendant is adequately presented by instructions regarding the difference between "minor" and "major" repairs.

Even though it would have been better for the trial judge not to give the spot-welded weapon as an example of an inoperable firearm, that example did not detract from the correctness of his charge as a whole. In giving his example, the trial judge noted that the spot weld would have to be destroyed before the gun could be fired. This passage concerning the spot weld was immediately followed by a clear statement that a weapon was not a firearm unless it could be made operable by a minor repair, replacement, or adjustment.

As for the defendant's remaining contentions, first, the trial judge correctly refused to instruct the jury on what the defendant characterizes on the evidence of the case as the lesser included offense of unlawful possession of a firearm. See *Commonwealth* v. *Seay,* 376 Mass. 735, 737 (1978), and cases therein cited. Second, for reasons which should be sufficiently obvious to eliminate any need for explanation, we decline to hold that the Massachusetts "humane practice" rule pertaining to confessions is applicable to search and seizure questions.[7]

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*

---

[7] The defendant makes an additional claim that it was error to deny his motion for a new trial, which was brought on the ground that the verdict was against the weight of the evidence. We see no error in the denial of the motion.