## COMMONWEALTH *vs.* DAVID LORD.

No. 99-P-1132.

Bristol. March 9, 2001. - June 21, 2002.

Present: BROWN, KAPLAN, & RAPOZA, JJ.

*Assault and Battery. Assault and Battery by Means of a Dangerous Weapon. Indecent Assault and Battery. Dangerous Weapon. Practice, Criminal,* Required finding, Duplicative convictions, Lesser included offense, Sentence.

The evidence at a criminal trial was sufficient to convict the defendant of assault and battery by means of a dangerous weapon within the meaning of G. L. c. 265, § 15A(*b*), namely, a mace-spraying device, because mace is dangerous per se, in that it is designed specifically to incapacitate a person by inducing tearing eyes, burning sensations on the skin, and breathing difficulties. [268-272]

A criminal defendant's convictions of both assault and battery by means of a dangerous weapon and assault and battery were not duplicative, where the defendant's attack upon the victim consisted of three separate and distinct acts, each of which was aimed at a different purpose; moreover, because the indictments related to separate acts, there was no error in imposing separate and consecutive sentences on them. [272-273]

The judge at a criminal trial did not deprive the defendant of his right to a full and fair sentencing hearing by preparing a sentencing memorandum prior to the hearing, where the memorandum was for the purpose of explaining the judge's reasons for departing from the penalty range of the sentencing guidelines, and did not commit the judge to a particular sentencing decision or amount to the imposition of sentence prior to the hearing; and where the defendant had the opportunity to address the court and to persuade the judge regarding the existence of mitigating circumstances that could impact the sentences imposed. [273-274]

INDICTMENTS found and returned in the Superior Court Department on September 19, 1996.

The cases were tried before *Elizabeth W. Dolan*, J.

*Richard J. Fallon* for the defendant.

*Daniel J. McColgan*, Assistant District Attorney, for the Commonwealth.

RAPOZA, J. During a brutal early morning street attack on two women in Fall River, the defendant sprayed one of his victims in the face with mace in an effort to subdue her. He now appeals his conviction pursuant to G. L. c. 265, § 15A(*b*), asserting that mace is not a dangerous weapon and that the trial judge erred in denying his motion for a required finding of not guilty. He also appeals his conviction for assault and battery on the same victim under G. L. c. 265, § 13A, claiming that, if his conviction for assault and battery by means of a dangerous weapon is upheld, the charges are duplicative. The defendant further claims that it was error for the judge to impose consecutive sentences on three indictments involving the same victim, stating that the three charges arose out of a single episode constituting one continuous action. Finally, he claims that the judge erred in drafting a memorandum indicating the penalty she intended to impose prior to the actual sentencing hearing. We affirm.

*Background.* In the early morning hours of August 31, 1996, Linda M. telephoned her friend, Cathy L.[1] Linda had been socializing at her house in Fall River with her brother and his girlfriend, and she and Cathy arranged to meet on foot between their two houses and then return to Cathy's house.

As Linda was walking past a public parking garage on her way to meet Cathy, a man (whom she later identified as the defendant) picked her up from behind, lifted her off the ground, and carried her into the garage. He banged her head on the cement and punched her in the face when she screamed. She testified that he then ripped off her underwear, attempted to perform oral sex on her, and vaginally raped her. In an effort to get her attacker closer to the nearby Fall River police station, and thus improve her chances of escaping, Linda told him that they could go back to her home. He agreed, telling her that if there was anyone there, he would kill her or them. He walked outside the garage with her, holding her by the neck.

Cathy, who had testified that she and Linda were to meet in front of the police station, continued past that location until she saw Linda walking with a man who was holding her by the

---

[1] The names are fictitious.

neck. Cathy and the man, whom she later identified as the defendant, then engaged in a "tug-of-war," each holding onto Linda and trying to pull her away from the other. Cathy was carrying a can of mace, and she told the defendant that if he did not let go of Linda she would use it.

Cathy began to spray mace at the defendant and continued to do so as he let go of Linda. The defendant then grabbed Cathy's hand and hit her. During the struggle, he also turned Cathy's wrist so that the cannister was pointed in her direction, causing her to be sprayed in the face with mace. He then picked up Cathy, threw her into the parking garage wall and hit and kicked her with his hands and feet. At a point, the defendant grabbed at Cathy's crotch area with one hand and continued to hit her with the other.

During the entire encounter, Cathy was screaming and, even when the defendant turned and started to run away, she ran after him and continued to scream. A police officer in a patrol car stopped and she told him what had happened. Cathy and Linda then proceeded to the police station where Cathy was able to give a physical description of the assailant. While at the station her eyes were burning from the mace and her face, hands, and neck also burned and had turned red. Within a short period of time, Linda and Cathy were driven to a nearby intersection where they were able to identify the defendant, now in custody, as their attacker. Linda and Cathy were then driven to the hospital for examination.[2]

Two police officers testified that during the arrest and booking of the defendant, they smelled mace on him to the point that they experienced a burning sensation in the eyes and throat. A State trooper, a police academy instructor in the use of mace and other chemical sprays, testified as an expert that the spray used by Cathy causes profuse tearing, produces a burning sensation in the face, and turns the skin red after contact. He also noted that the spray could make it hard for an individual to breathe and that the effects could last anywhere from a few

---

[2]Both Cathy and Linda suffered various physical injuries: Linda had a bruise on her forehead, abrasion on her knee, and a cracked orbit (facial bone); Cathy testified that, in addition to the effects of the mace, she had a bruise in the shape of a palm print on her arm and her ear was very sore.

268        55 Mass. App. Ct. 265 (2002)

Commonwealth *v.* Lord.

minutes to several days. The severity of the reaction, he asserted, varies depending upon one's sensitivity and tolerance for pain.

The defendant was indicted on charges of rape and assault and battery on Linda; and assault with intent to rape, assault and battery by means of a dangerous weapon (mace), indecent assault and battery, and assault and battery on Cathy. The trial judge entered a required finding of not guilty on the charge of assault with intent to commit rape against Cathy, and the jury acquitted the defendant on the rape charge involving Linda. He was found guilty of the four other crimes with which he had been charged.[3]

1. *Sufficiency of the evidence concerning mace as a dangerous weapon.* The defendant argues that the Commonwealth did not prove beyond a reasonable doubt that the mace-spraying device used here is a dangerous weapon.[4] Although the defendant concedes that the device used on Cathy is a weapon,[5] he argues that mace is not "dangerous" within the meaning of G. L. c. 265, § 15A(*b*), and, therefore, his conviction for assault and battery by means of a dangerous weapon cannot stand.

"Our statutes do not define the term 'dangerous weapon,' but we have consistently said that there are things that are dangerous per se and those that are dangerous as used." *Com-*

---

[3]The defendant was sentenced as follows: for the conviction of assault and battery by means of a dangerous weapon (mace), he was sentenced to nine to ten years in State prison; for the indecent assault and battery conviction, he received a sentence of four to five years in State prison, to be served from and after the sentence imposed on the assault and battery by means of a dangerous weapon conviction. The defendant was then sentenced, on the conviction of assault and battery upon Linda, to two and one-half years at the house of correction, to be served from and after the second State prison sentence; and for the assault and battery on Cathy, the defendant was sentenced to five years probation to begin from and after the completion of his sentence at the house of correction. See note 15, *infra.*

[4]His appeal raises an issue of first impression in that we have not previously been required to decide "whether the chemical Mace or similar chemicals constitute weapons 'dangerous per se.' " *Commonwealth* v. *Barrett*, 386 Mass. 649, 655 n.10 (1982).

[5]By "weapon" we mean "an instrument of offensive or defensive combat; . . . anything *used, or designed to be used,* in destroying, defeating or injuring, an enemy" (emphasis in original). *Commonwealth* v. *Sampson*, 383 Mass. 750, 754 (1981), quoting from Webster's New Intl. Dictionary 2892 (2d ed. 1959).

*monwealth* v. *Tevlin*, 433 Mass. 305, 310 (2001).[6] See *Commonwealth* v. *Appleby*, 380 Mass. 296, 303 (1980); *Commonwealth* v. *Sexton*, 425 Mass. 146, 149 (1997). We conclude that the mace-spraying device at issue here was dangerous per se. Consequently, the defendant's motion for a required finding of not guilty was properly denied.

Weapons regarded as dangerous per se, such as firearms, daggers, stilettos and brass knuckles, are instrumentalities "designed and constructed to produce death or great bodily harm," and are classified in this manner "because they are designed for the purpose of bodily assault or defense." *Commonwealth* v. *Appleby*, 380 Mass. at 303. Thus, our analysis must consider a device's design and intended purpose and whether it is capable of causing death or the requisite degree of bodily harm.[7] The particular device used here, a cannister that sprays mace, is dangerous per se because it was designed for the sole purpose of bodily assault

---

[6] By not defining the term "dangerous weapon" in G. L. c. 265, § 15A, the Legislature is "presumed to have intended to incorporate the common law definition of that phrase, at least in so far as it is not inconsistent with the terms or the purpose of the statute." *Commonwealth* v. *Cotto*, 52 Mass. App. Ct. 225, 227 (2001), quoting from *Commonwealth* v. *Ricardo*, 26 Mass. App. Ct. 345, 356 (1988). Thus, our ruling today, that mace is a dangerous weapon per se, is limited to charges brought under § 15A, and we are not bound by other statutory definitions or classifications, such as those contained in G. L. c. 140, § 121 (defining various firearm-related weapons), and G. L. c. 269, § 10(*b*) (enumerating other prohibited weapons).

[7] The quantum of harm has been variously described as "great bodily harm," *Commonwealth* v. *Farrell*, 322 Mass. 606, 614-615 (1948); "serious injury," *Commonwealth* v. *Tarrant*, 367 Mass. 411, 416 n.4 (1975); "serious bodily harm," *Commonwealth* v. *Appleby*, 380 Mass. 296, 307 (1980); and bodily harm that "endangers another's safety." *Commonwealth* v. *Sexton*, 425 Mass. 146, 149 (1997).

In each case, excluding those obvious ones involving death, the harm is "calculated to interfere with the health or comfort of the [victim]. Such hurt or injury need not be permanent, but must . . . be more than merely transient and trifling." *Commonwealth* v. *Farrell*, 322 Mass. at 621, quoting from *Rex* v. *Donovan*, 2 K.B. 498, 507 (1934). See *Commonwealth* v. *LeBlanc*, 3 Mass. App. Ct. 780, 780 (1975) (conviction for assault and battery with a dangerous weapon affirmed where police officer, who was not otherwise injured, was temporarily knocked off his feet by car door).

The degree of bodily harm that a weapon must be capable of inflicting is the same, whether the weapon is inherently dangerous or dangerous as used. The primary difference between weapons in these two categories is in their design and purpose.

or defense and was constructed to inflict serious bodily harm through incapacitation, and because, in these circumstances, the defendant used it in a manner consistent with its design.

At trial, the State trooper, who testified as an expert in the use of mace and other chemical sprays, examined the particular spray used by the defendant on Cathy.[8] He described it as "old style mace,"[9] which he claimed differs from what is commonly known as pepper spray.[10] Based on his professional training and familiarity with mace, and having himself been sprayed on a number of occasions, the trooper told the jury of its disabling effects on the body. He stated that it causes

> "a burning sensation on your face, almost like pins and needles type burning. You're going to get a lot of tearing. The CN gas attacks your tear ducts and causes you to tear a lot in your eyes. Your nose and all your glands in your nose and mouth are going to start to drool, and a lot of phlegm and that type of product is going to be coming out of your body. It's also going to affect your breathing. When you inhale it, it's going to feel a tight sensation in your lungs, like you'll have a hard time breathing. It's all part of the disabling effects of the spray."

He also testified that when the spray comes in contact with skin it causes irritation and redness similar to a sunburn which, depending on a person's sensitivity, can last as little as forty minutes to an hour or for as long as a couple of days.

Thus, as described by the trooper, mace is a weapon designed specifically to incapacitate a person by inducing tearing eyes, burning sensations on the skin, and breathing difficulties. Although the degree of debilitation depends on an individual's sensitivity and tolerance for pain, mace is nonetheless designed to exert very painful and disabling effects. It is also likely to inflict such injuries when used, as it was here, in the manner for which it was designed.

---

[8]He was the sole expert at trial.

[9]Without further elaboration, he also described the cannister as containing "CN gas or what is commonly known as tear gas."

[10]The facts of this case do not require us to determine whether pepper spray or any other aerosol products designed as weapons are dangerous per se.

Evidence adduced at trial indicates that Cathy used the mace in an attempt to protect herself and Linda from an attack by the defendant. The defendant, in an effort to overpower her, turned Cathy's weapon against her by pointing it in the direction of her face as she continued to spray. Following the encounter, Cathy suffered from burning eyes, and her face, neck, and arms were both red and burning, indicating that she had experienced injuries of the type described by the State trooper.

Even if Cathy did not actually suffer serious bodily injury,[11] something we need not decide, the mace was nonetheless inherently dangerous because of its capacity to inflict serious harm. See *Commonwealth* v. *Appleby*, 380 Mass. at 307 n.6 ("Weapons which are dangerous per se will qualify for [G. L. c. 265,] § 15A[,] convictions when used to commit an assault and a battery of any kind, and without a jury determination that the weapon was dangerous as used").

Other jurisdictions have determined, in different contexts, that mace or tear gas devices are dangerous weapons capable of causing serious bodily injury. Several Federal circuits have concluded that such devices are sufficiently dangerous to warrant penalty enhancements under the Federal sentencing guidelines.[12] See *United States* v. *Dukovich*, 11 F.3d 140, 142-143 (11th Cir.), cert. denied, 511 U.S. 1111 (1994) (tear gas caused eye pain, severe headaches, and burning sensations in victims' faces and throats); *United States* v. *Robinson*, 20 F.3d 270, 278 (7th Cir. 1994) (mace sprayed by defendant during bank robbery caused "pain which lasted for hours and had some residual effect for days"); *United States* v. *Bartolotta*, 153 F.3d 875, 879 (8th Cir. 1998), cert. denied, 525 U.S. 1093 (1999) (mace caused victim to develop "chemical pneumonia" and to require medication for one year to cleanse mace from her body).

---

[11]The record is inconclusive concerning the degree of harm Cathy suffered from the mace-induced injuries.

[12]The Federal Sentencing Guidelines define "dangerous weapon" as "an instrument capable of inflicting death or serious bodily injury." Commentary to Federal Sentencing Guidelines, 18 U.S.C. § 1B1.1, Application Notes, n.1(d) (1996). "Serious bodily injury" means an "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." *Id.* at n.1(j). See *United States* v. *Dukovich*, 11 F.3d 140, 142 (11th Cir.), cert. denied, 511 U.S. 1111 (1994).

See also *Pitts* v. *Oklahoma*, 649 P.2d 788, 791 (Okla. Crim. App. 1982) (mace is capable of causing great bodily harm).

The defendant's motion for a required finding of not guilty was properly denied, and it was appropriate to submit to the jury the indictment charging him with assault and battery by means of a dangerous weapon under G. L. c. 265, § 15A(*b*).

2. *Duplicative convictions and consecutive sentences.* The defendant contends that his convictions for both assault and battery by means of a dangerous weapon and assault and battery on Cathy were duplicative, claiming that, in these circumstances, one charge was merely a lesser included offense of the other. He also argues that the court erred in imposing consecutive sentences on the three indictments involving Cathy as a victim,[18] on the ground that they arose out of single episode constituting one continuous action. We disagree.

The defendant's attack upon Cathy consisted of three separate and distinct acts, each of which was aimed at a different purpose. The first crime (assault and battery by means of a dangerous weapon) occurred when the defendant turned the mace against Cathy to prevent her from helping Linda escape his grasp. Second, once Linda was freed, he turned his attention to Cathy by hurling her against the concrete wall and battering her with his hands and feet (the assault and battery), inferably as retaliation for her interference. Lastly, the indecent assault and battery took place when the defendant grabbed at Cathy's crotch, apparently attempting to remove her underwear, as Linda had testified he had done to her. Thus, there were three separate acts upon which the jury could reasonably base the three convictions. See *Commonwealth* v. *Sanchez*, 405 Mass. 369, 381-382 (1989); *Commonwealth* v. *Fitzpatrick*, 14 Mass. App. Ct. 1001, 1002-1003 (1982); *Commonwealth* v. *Connolly*, 49 Mass. App. Ct. 424, 427 (2000). Accordingly, in the circumstances of this case, the charges of assault and battery by means of a dangerous weapon and assault and battery related to two separate acts, and the latter was not a lesser included offense of the former. Moreover, because the three indictments involving

---

[18]Assault and battery by means of a dangerous weapon, assault and battery, and indecent assault and battery.

Cathy as a victim related to separate acts, there was no error in the imposition of separate and consecutive sentences on them.

3. *Sentencing memorandum.* The defendant argues that because the trial judge prepared a sentencing memorandum in which she had already determined the sentence to be imposed prior to the sentencing hearing, he is entitled to a new sentencing before a different judge. Although it is not well developed in the defendant's brief, it appears that the gist of his argument is that, because the judge prepared a sentencing memorandum prior to the hearing, his case had been prejudged and he was deprived of his right to a full and fair sentencing hearing.

The memorandum prepared by the judge was for the purpose of explaining her reasons for departing from the penalty range suggested by the sentencing guidelines.[14] Thus, she set forth the aggravating factors that caused her to impose the maximum sentences permitted by the relevant statutes. The preparation of the memorandum did not, however, commit the judge to a particular sentencing decision, nor did it amount to an imposition of sentence prior to the hearing, nor did it preclude the defendant from being heard with respect to sentencing, as is his right pursuant to Mass.R.Crim.P. 28(b), 378 Mass. 898 (1979).[15] See *Commonwealth* v. *Rancourt,* 399 Mass. 269, 277-278 (1987). Contrast *Katz* v. *Commonwealth,* 379 Mass. 305, 315-316 (1979) (error to sentence defendant for criminal contempt prior to definitive determination of guilt and without allowing

[14]Our review of the trial transcript reveals that, after the Commonwealth moved for sentencing, the judge announced, without objection, that she was going to continue the matter for four days to permit her to review the defendant's probation record along with the sentencing guidelines. During those four days, the judge reflected on the case, reviewed the defendant's history with a probation officer who calculated the sentencing guidelines, and reviewed her trial notes for aggravating and mitigating factors that would impact sentencing. Although she prepared her memorandum during that period, she did not file it with the clerk until after the Commonwealth and defendant's counsel had addressed the court with their sentencing recommendations.

[15]After the sentences were announced, the defendant expressed his concern that they had been applied to the wrong indictments. Treating his remarks as a motion to revise or revoke the defendant's sentences, the judge allowed the motion and ordered the corrections requested by counsel. The judge's actions suggest that she considered the arguments of counsel, albeit regarding an administrative aspect of the sentence, even *after* the sentence had been recited by the clerk.

him or counsel to be heard on sentencing). We note, however, that the court in *Katz* "[did] not criticize the judge for taking time to consider the case and to prepare findings and conclusions." *Id.* at 316. We discern no indication of prejudging.

Here, the defendant had the opportunity to address the court and to persuade the judge regarding the existence of mitigating circumstances that could impact the sentences imposed. Moreover, he does not argue that the judge below disregarded any evidence he presented that would have affected his sentences. Indeed, our review of the transcript of the sentencing hearing reveals that the defendant presented no such evidence and merely argued for the adoption of the sentences indicated by the guidelines. There was no error in these circumstances, and a new sentencing hearing is not warranted.

*Judgments affirmed.*