COMMONWEALTH *vs.* WYNTON W., a juvenile.

Middlesex. March 8, 2011. - May 19, 2011.

Present: IRELAND, C.J., SPINA, COWIN, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.[1]

*Dangerous Weapon. Statute,* Construction. *School and School Committee,* Enforcement of discipline. *Words,* "Dangerous weapon."

This court concluded that the phrase "dangerous weapon," as it is used in G. L. c. 269, § 10 (*j*) (prohibiting the possession of a firearm or other dangerous weapon on the grounds of any school, college, or university), must be interpreted as incorporating the common-law definition of that phrase, i.e., those objects that are dangerous per se (designed for the purpose of bodily assault or defense) and those things that become dangerous weapons because they are used in a dangerous fashion. [746-755]

COMPLAINT received and sworn to in the Middlesex County Division of the Juvenile Court Department on May 7, 2009.

A motion to dismiss was heard by *Margaret S. Fearey,* J., and a question of law was reported to the Appeals Court by her.

The Supreme Judicial Court granted an application for direct appellate review.

*Amanda J. Rowan,* Assistant District Attorney (*Kevin J. Curtin,* Assistant District Attorney, with her) for the Commonwealth.

*Viktor Theiss* for the juvenile.

SPINA, J. In this matter we consider a question reported by a judge in the Juvenile Court: "Whether a knife that is not a per se dangerous weapon enumerated in G. L. c. 269, § 10 (*b*), may constitute a 'dangerous weapon' as that term is used in G. L. c. 269, § 10 (*j*), when that knife is not being used in a dangerous manner." The matter came before the Juvenile Court on the juvenile's motion to dismiss and, on the oral motions of both the juvenile and the Commonwealth, was reported pursuant to Mass. R. Crim. P. 34, as amended, 442 Mass. 1501 (2004). We

---

[1]Justice Cowin participated in the deliberation on this case prior to her retirement.

consider the matter on the stipulated facts and hold that the phrase "dangerous weapon" as used in G. L. c. 269, § 10 (*j*), should be given its common-law meaning. We remand the case for further proceedings consistent with this opinion.

1. *Facts.* The parties have stipulated that the police report attached to the application for criminal complaint constitutes an accurate and full statement of the facts. That report is summarized as follows:

On April 1, 2009, Officer Michael Gough of the Marlborough police department was dispatched to Assabet Valley Regional High School on a report that a student, the juvenile, had been found in possession of a knife. When Officer Gough met with the juvenile in the dean's office, the juvenile admitted that the knife in question was his and that his father had given it to him three days before on the occasion of his sixteenth birthday. The knife had fallen out of his pocket in shop class and had been seen on the floor by the instructor, who reported the juvenile to the dean. The knife was a small folding knife with a blade approximately two inches long with a black plastic and metal handle. The juvenile's father confirmed for Officer Gough that the knife had indeed been a recent birthday present.

The school suspended the juvenile pursuant to its own procedures. He was then charged with possession of a dangerous weapon on the grounds of a school in violation of G. L. c. 269, § 10 (*j*). The juvenile filed a motion to dismiss pursuant to Mass. R. Crim. P. 13 (c), as appearing in 442 Mass. 1516 (2004), on the ground that the knife in question is not a dangerous weapon. The judge determined that the question of law presented in the motion is dispositive of the case, and the parties both moved to report the above-quoted question to the Appeals Court. We granted the Commonwealth's application for direct appellate review.

2. *Analysis.* The reported question hinges on the meaning of the phrase "dangerous weapon" in § 10 (*j*), which provides:

> "Whoever, not being a law enforcement officer, and notwithstanding any license obtained by him under the provisions of [G. L. c. 140], carries on his person a firearm . . . or other dangerous weapon in any building or on

the grounds of any elementary or secondary school, college or university without the written authorization of the [school] shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than one year, or both."

Possession of a dangerous weapon by a student or any other individual on the grounds of an educational institution is thus a misdemeanor.[2] *Id.* However, the term "dangerous weapon" is not specifically defined in § 10, in the remainder of G. L. c. 269, or elsewhere in the General Laws. Interpretation of the term as used in § 10 (*j*) appears to be a question of first impression.

"We interpret a statute 'according to the intent of the Legislature ascertained from all its words construed in the ordinary and approved usage of the language . . . to the end that the purpose of its framers may be effectuated.' " *Commonwealth* v. *Deberry,* 441 Mass. 211, 215 (2004) (*Deberry*), quoting *Hanlon* v. *Rollins,* 286 Mass. 444, 447 (1934). "Where the statutory language is not conclusive, we may 'turn to extrinsic sources, including the legislative history and other statutes, for assistance in our interpretation.' " *Deberry, supra,* quoting *Chandler* v. *County Comm'rs of Nantucket County,* 437 Mass. 430, 435 (2002). "Where the Legislature does not define a term, we presume that its intent is to incorporate the common-law definition of that term, 'unless the intent to alter it is clearly expressed.' " *Commonwealth* v. *Stokes,* 440 Mass. 741, 747 (2004), quoting *Commonwealth* v. *Burke,* 392 Mass. 688, 690 (1984). "Where the Legislature uses the same words in several sections which concern the same subject matter, the words 'must be presumed to have been used with the same meaning in each section.' " *Insurance Rating Bd.* v. *Commissioner of Ins.,* 356 Mass. 184, 188-189 (1969), quoting *Lidell* v. *Standard Acc. Ins. Co.,* 283 Mass. 340, 346 (1933). Finally, "[i]f it is a criminal statute [that] we interpret, the rule of lenity requires that the defendant be given the benefit of the ambiguity." *Deberry, supra* at 216.

---

[2]Section 10 (*j*) further provides that "[a]ny officer in charge of an [educational institution] or any faculty member . . . failing to report violations of [§ 10 (*j*)] shall be guilty of a misdemeanor and punished by a fine of not more than five hundred dollars."

A number of analytical approaches are suggested to us on appeal. The motion judge, through the phrasing of the reported question, posits that the proper definition for the phrase "dangerous weapon" may be the list of items prohibited pursuant to G. L. c. 269, § 10 (*b*). In contrast, the juvenile argues that the list of items prohibited under that statute is somewhat arbitrary and limited and that, as a result, § 10 (*j*) is better interpreted by giving the phrase "dangerous weapon" its ordinary meaning under the common law. See *Commonwealth* v. *Turner*, 59 Mass. App. Ct. 825, 828 (2003). Finally, the Commonwealth argues that these approaches are incorrect; it offers no alternative definition but proposes that the absence of a firm definition does not require that the statute be held void for vagueness because a separate statute, G. L. c. 71, § 37H, provides that "[a]ny student who is found on school premises . . . in possession of a dangerous weapon, including, but not limited to, a gun or a knife . . . may be subject to expulsion."

Considering these positions, we begin our analysis by noting the State's extraordinary responsibility to ensure the safety of students in the educational institutions of the Commonwealth. See *Doe* v. *Superintendent of Schs. of Worcester*, 421 Mass. 117, 131 (1995) ("the Legislature's and school officials' duty to provide children an adequate public education includes the duty to provide a safe and secure environment in which all children can learn"). This responsibility grants the Legislature authority to regulate conduct by students in schools that "would be perfectly permissible if undertaken by an adult," *New Jersey* v. *T.L.O.*, 469 U.S. 325, 339 (1985), or that might be appropriate if occurring outside the school setting. The case before us does not present a question of the Legislature's authority to protect students in schools, however, but rather a question of what the Legislature intended when enacting § 10 (*j*).

Section 10 (*j*) renders it a criminal offense to "carry[] on his person a firearm . . . or other dangerous weapon in any building or on the grounds of any . . . school." Section 10 (*j*) makes carrying a dangerous weapon a criminal offense, and includes no specific intent requirement. *Id.* The crucial language of § 10 (*j*), exactly which objects are prohibited, is not defined, and therefore we must look to extrinsic aids in interpreting the

statute. *Id.* See *Deberry, supra.* We note that the phrase "dangerous weapon" has a defined meaning under the common law that is routinely applied to those statutory crimes that have a dangerous weapon element. See *Commonwealth* v. *Porro,* 458 Mass. 526, 529 (2010). Under the common law of Massachusetts, dangerous weapons include those objects that are dangerous per se — "designed and constructed to produce death or great bodily harm" and "for the purpose of bodily assault or defense," *Commonwealth* v. *Appleby,* 380 Mass. 296, 303 (1980) — as well as those objects that are dangerous as used — items that are not dangerous per se but "become dangerous weapons because they 'are used in a dangerous fashion.' " *Commonwealth* v. *Tevlin,* 433 Mass. 305, 310 (2001), quoting *Commonwealth* v. *Appleby, supra* at 304. "The interpretation of well-defined words and phrases in the common law carries over to statutes dealing with the same or similar subject matter." 2B N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 50:3, at 176 (7th ed. 2008). We presume, therefore, that the Legislature's decision to use a term with a common-law meaning in § 10 (*j*) indicates an intention to adopt that common-law definition.

The application of this rule of construction is bolstered by the use of the phrase "dangerous weapon" in similar statutes and the general regulatory framework. See *Insurance Rating Bd.* v. *Commissioner of Ins., supra.* The most closely analogous provision, G. L. c. 269, § 10 (*b*), is contained in the same statute as § 10 (*j*) and establishes the statutory crime of carrying a dangerous weapon. Section 10 (*b*) contains two parts, the first of which does not include the phrase "dangerous weapon" but prohibits the carrying of:

> "any stiletto, dagger or device or case which enables a knife with a locking blade to be drawn at a locked position, any ballistic knife, or any knife with a detachable blade capable of being propelled by any mechanism, dirk knife, any knife having a double-edged blade, or a switch knife, or any knife having an automatic spring release device by which the blade is released from the handle, having a blade of over one and one-half inches."

This portion of § 10 (*b*) lists a number of objects that are

dangerous per se and that may not be carried by any individual in any location, "except as provided by law." The second portion of § 10 (*b*) provides:

> "[W]hoever, when arrested upon a warrant for an alleged crime, or when arrested while committing a breach or disturbance of the public peace, is armed with or has on his person . . . a billy or other dangerous weapon other than those herein mentioned . . . shall be punished by imprisonment for not less than two and one-half years nor more than five years in the state prison, or for not less than six months nor more than two and one-half years in a jail or house of correction."

This second portion of § 10 (*b*) includes the dangerous items listed in the first portion of § 10 (*b*) as well as "other dangerous weapon[s]" and thus sweeps more broadly than the specifically prohibited items. The Appeals Court has interpreted the phrase "dangerous weapon" in this context as incorporating the common-law definition. Cf. *Commonwealth* v. *Thompson*, 15 Mass. App. Ct. 974 (1983) (defendant, arrested on outstanding warrants, was in violation of § 10 [*b*] where she carried eight-inch steak knife "for her protection"); *Commonwealth* v. *Blavackas*, 11 Mass. App. Ct. 746, 752-753 (1981) (defendant, arrested as disorderly person, was not in violation of § 10 [*b*] where eight-inch kitchen bread knife in her possession was not being used as dangerous weapon). As experience has shown in interpreting these provisions of § 10 (*b*), the common law includes as dangerous weapons, whether per se or as used, a number of items not covered by the list of objects in § 10 (*b*). See, e.g., *Commonwealth* v. *Lord*, 55 Mass. App. Ct. 265, 269 n.6, 271 (2002) (although not included in § 10 [*b*], chemical mace is per se "dangerous weapon" under common law); *Commonwealth* v. *Thompson, supra.*

Another statute that uses the phrase "dangerous weapon," G. L. c. 265, § 15A (*b*), establishes the statutory crime of assault and battery by means of a dangerous weapon and provides, in part, that "[w]hoever commits an assault and battery upon another by means of a dangerous weapon shall be punished . . . ." Because it did not define "the term 'dangerous weapon'

in G. L. c. 265, § 15A, the Legislature is 'presumed to have intended to incorporate the common law definition of the phrase, at least in so far as it is not inconsistent with the terms or the purpose of the statute.' " *Commonwealth* v. *Lord, supra* at 269 n.6, quoting *Commonwealth* v. *Cotto,* 52 Mass. App. Ct. 225, 227 (2001). As in G. L. c. 269, § 10 (*b*), and G. L. c. 265, § 15A, the Legislature used the phrase "dangerous weapon" in G. L. c. 269, § 10 (*j*), without additional or supplemental definition. The Legislature is presumed to be aware of the manner in which its statutes have been interpreted, *Commonwealth* v. *Vega,* 449 Mass. 227, 231-232 (2007), and we accordingly may infer that by using the term "dangerous weapon" without further definition it intended to achieve the same result in G. L. c. 269, § 10 (*j*), that prevailed in G. L. c. 269, § 10 (*b*), and G. L. c. 269, § 15A. Precedent surrounding those statutes is thus highly persuasive regarding interpretation of § 10 (*j*).

The Commonwealth argues that the better analogy is to G. L. c. 71, § 37H, which requires that every secondary school student be provided with a handbook warning them that "possession of a dangerous weapon, including, but not limited to, a gun or knife" subjects the student to the risk of expulsion. See *Doe* v. *Superintendent of Schs. of Worcester,* 421 Mass. 117, 119, 134 (1995) ("The type of knives included as dangerous weapons in § 37H is all inclusive"). Even though § 10 (*j*) lacks the additional definition of "dangerous weapon" that is found in § 37H ("including, but not limited to, a gun or knife"), the Commonwealth argues that this language should be imported to § 10 (*j*) because the Legislature was simultaneously considering both statutes, because the Legislative purpose of § 10 (*j*) would be undermined if criminal sanctions were not applied to all knives, and because any other holding would render the statutory scheme nonsensical. These arguments are not persuasive.

The Commonwealth's first argument actually undercuts its position. The fact that the Legislature simultaneously drafted two statutes does not necessarily indicate that the Legislature intended them to have identical meanings. See St. 1989, c. 603 (amendments to § 37H approved December 15, 1989); St. 1989, c. 648 (new § 10 [*j*] approved January 3, 1990). "[T]he same

words in different parts of a statute enacted at the same time
. . . should receive the same meaning." *Green* v. *Board of
Appeals of Provincetown*, 404 Mass. 571, 573 (1989). The cor-
ollary to this rule, however, is not that *different* words in statutes
enacted at the same time should have the *same* meaning — the
inference is, in fact, the opposite. See *Champigny* v. *Com-
monwealth*, 422 Mass. 249, 252-253 (1996) ("Different words
often do mean different things"). The language used in § 37H
clearly demonstrates that the Legislature knew that certain knives
fall outside the common-law definition of per se "dangerous
weapons" and did not wish this definition to have effect regard-
ing school disciplinary proceedings. The Legislature made no
such provision regarding § 10 (*j*). Thus, we infer that it did not
intend to include the supplemental definition that the Com-
monwealth proposes we read into the statute.

The Commonwealth's second argument is similarly unpersua-
sive because it is not at all clear that subjecting a student to
expulsion but not Juvenile Court proceedings or criminal pros-
ecution for bringing certain knives to school would undermine
the purposes of § 10 (*j*). School discipline, up to and including
expulsion, is not an arm of criminal law, and the sanctions
imposed by school administrators serve pedagogical, corrective,
safety, and disciplinary purposes rather than the punitive, retribu-
tive, or deterrent purposes that may underlie criminal sanctions.[3]
It is not irrational for the Legislature to have determined that
possession of a two-inch folding knife in a secondary school
may warrant administrative sanction (up to and including expul-
sion) without warranting criminal sanctions (up to and including
one year in prison). Accordingly, we do not conclude that appli-
cation of the common-law definition of "dangerous weapon" in
§ 10 (*j*) would frustrate legislative purposes.

---

[3]Considering their subject matter, it appears likely that G. L. c. 269, § 10 (*j*),
and G. L. c. 71, § 37H, most frequently will be applied in the Juvenile Court,
and we therefore note that the purposes underlying the juvenile justice system
differ significantly from those underlying the criminal justice system. See R.L.
Ireland, Juvenile Law § 1.3 (2d ed. 2006 & Supp. 2010) (addressing philosophy
and judicial goals of juvenile justice system). The general purposes of the
criminal justice system are relevant to our consideration here, however, because
G. L. c. 269, § 10 (*j*), is a general criminal statute not limited to delinquency
proceedings.

Finally, the Commonwealth asserts that redundancy and absurdity would result if § 10 (*j*) is read as either adopting the common law or incorporating the list of dangerous weapons set forth in § 10 (*b*). The Commonwealth's arguments in this regard need not be addressed at length. Contrary to the Commonwealth's assertion, the potential for some overlap between §§ 10 (*b*) and 10 (*j*) does not render § 10 (*b*) a lesser included offense of § 10 (*j*). Further, the Commonwealth's argument that the purposes of § 10 (*j*) require an extremely broad interpretation does not assist us in determining where, precisely, the Legislature determined to draw the line between objects properly brought to school and those that give rise to criminal liability.[4] In *Commonwealth v. Turner*, 59 Mass. App. Ct. 825, 830-831 (2003), quoting *Commonwealth v. Clint C.*, 430 Mass. 219, 227 (1999), the Appeals Court succinctly addressed the difficulties inherent in an open-ended definition of "dangerous weapon:"

> "Two insurmountable problems with [such a] position immediately emerge. The first is the limitless nature of the construction the Commonwealth urges. If a 'dangerous weapon' is any object that has the potential for harming [students] while they are [in school] . . . [then] all but the shoeless . . . would find themselves beneath the statute's broad cover. We decline to adopt an interpretation that would produce such an absurd result.

> "The second problem relates to the first. Due process requires 'fair notice of the proscribed conduct' . . . [and]

---

[4]More specifically, the Commonwealth argues that "[i]t would be contrary to legislative intent to limit the scope of [§] 10 (*j*)'s reach to weapons that are actually being 'used' in a dangerous manner." What distinguishes an item innocently carried on the grounds of an educational institution and one that constitutes a dangerous weapon is often, however, the use to which that item may be put at any moment. There is thus a broad category of items that courts have recognized to be dangerous weapons when used as such that, in the absence of some express statement, we cannot assume the Legislature meant to ban from schools and universities. See *Commonwealth v. Tevlin*, 433 Mass. 305, 310-312 (2001) (shoes); *United States v. Bankston*, 121 F.3d 1411, 1412 n.1 (11th Cir. 1997) (pens); *Commonwealth v. Kivlehan*, 57 Mass. App. Ct. 793, 797 (2003) (chairs); *Commonwealth v. Cherubin*, 55 Mass. App. Ct. 834, 842 (2002) (automobiles); *Commonwealth v. Conley*, 34 Mass. App. Ct. 50, 57 (1993) (scissors); *Kelly v. State*, 218 P.3d 291, 301-302 (Alaska 2009) (sharpened pencils).

> [a]cceptance of the Commonwealth's position would . . .
> produce a statutory scheme with the potential for criminal-
> izing otherwise innocent activity in a way that provides a
> defendant with no notice of his conduct's prohibited nature
> until after the crime had occurred."

There must be some defined limits to the meaning of "danger-
ous weapon" under § 10 (*j*), and as a matter of fundamental
fairness, the matter cannot be left to well-intentioned, but ad
hoc, determinations. This is particularly true where § 10 (*j*)
mandates that all potential violations, without exception, be
referred from the educational to the criminal justice system.

We turn then to answer the reported question in light of our
holding that "dangerous weapons" under § 10 (*j*) are those
"objects that are dangerous per se, i.e., objects that are . . .
'designed for the purpose of bodily assault or defense' . . . and
objects that are dangerous as used, i.e., 'those things that become
dangerous weapons because they are "used in a dangerous
fashion." ' ' " *Commonwealth* v. *Turner, supra* at 828, quoting
*Commonwealth* v. *Appleby*, 380 Mass. 296, 303 (1980), and
*Commonwealth* v. *Tevlin*, 433 Mass. 305, 310 (2001). This de-
finition includes knives that are "designed and constructed to
produce death or great bodily harm" but that are not necessarily
stilettos, daggers, dirk knives, or the other objects listed in
§ 10 (*b*).[5] *Commonwealth* v. *Appleby, supra.* Such knives are
dangerous per se under the common law and thus prohibited

---

[5]In considering this category, we note a stray comment in *Commonwealth* v.
*Turner*, 59 Mass. App. Ct. 825, 828 (2003), stating that "[s]traight knives
typically are regarded as dangerous per se while folding knives, at least those
without a locking device, typically are not." See *Commonwealth* v. *Allen*, 76
Mass. App. Ct. 9, 12 n.5 (2009), citing *Commonwealth* v. *Turner, supra* at
828-829; *Commonwealth* v. *Molligi*, 70 Mass. App. Ct. 108, 113 (2007) (same).
This is an incorrect statement of the law.

The *Turner* opinion, *supra*, relies on *Commonwealth* v. *Appleby*, 380 Mass.
296, 303-304 (1980), where this court identified various weapons that are
dangerous per se because of their designed purpose (e.g., "firearms, daggers,
stilettos, and brass knuckles"), then cited cases noting that knives, and many
other tools and household items, might be used as dangerous weapons but are
not dangerous per se. The *Turner* case also cites *Commonwealth* v. *Miller*, 22
Mass. App. Ct. 694, 695 (1986), where the Appeals Court analyzed the mean-
ing of the term "dirk knife" under § 10 (*b*) and concluded that, in common
usage, it refers to "a long straight-bladed dagger or short sword usually
defined by comparison with the ceremonial weapons carried by Scottish

from schools under § 10 (*j*). The reported question asks if such a category exists, and we must therefore answer in the affirmative. Although it appears unlikely that the two-inch folding knife carried by the juvenile constitutes a dangerous weapon within the common-law definition, we make no holding in this respect because we rely exclusively on the stipulated facts and are thus without complete information regarding the design, purpose, and construction of the knife. See *Commonwealth* v. *Appleby, supra.*

3. *Conclusion.* For the reasons set forth above, we hold that the phrase "dangerous weapon," as used in § 10 (*j*), must be interpreted as incorporating the common-law definition of that phrase. Comparison between that definition and the list of prohibited items under § 10 (*b*) requires that we answer the reported question in the affirmative. This matter is remanded to the Juvenile Court for further proceedings consistent with this opinion.

*So ordered.*

---

highlanders and naval officers of the Eighteenth and Nineteenth Centuries." The *Miller* case does not state that all straight-bladed knives are "dirk knives" or otherwise dangerous per se, and none of the other cases cited in the *Turner* case stands for such a proposition or for a general understanding that folding blades are inherently more or less dangerous than straight blades.

Straightness of a blade, like its length, a locking mechanism, a serrated edge, or any other individual feature, is not dispositive of the question whether a knife is dangerous per se under the common law. See *Commonwealth* v. *Appleby, supra.* Rather, the question is whether the knife is "designed for the purpose of bodily assault or defense" and "to produce death or great bodily harm," or whether it has some other useful purpose and is only dangerous when used in a dangerous fashion. *Id.* See *Commonwealth* v. *Tevlin, supra* at 310.